[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Commissioner of DCYS petitioned this court to terminate the parental rights of Belinda D., the mother of Robert D. who was born to her on November 3, 1986. On a prior proceeding, the child was adjudicated to be both neglected and uncared for on August 18, 1987, finding based on an agreement, although the mother was not in attendance and no lawyer represented her interest.
The Commissioner has placed Robert D. with foster parents who are licensed foster parents, able to cope with the child's needs which are many. He is fed through a tube inserted in his stomach. He sleeps hooked to a respirator. He is nonverbal, and although he can hear and can see, is unresponsive except to tactile stimulation, (State's Exhibit B, Dr. M. Nelken's report). The child shows no signs of any thinking or intelligence; insight and judgment are not evident. (Id. pp. 2-3). His pediatrician testified that his intelligence is at the level of an infant 6 to 8 months old. He suffers from myotonic dystrophy, is permanently disabled and needs constant care, (Id. p. 3). CT Page 1443
Newington Children's Hospital made the following entry regarding Robert's condition:
 "May 8, 1989 Muscle Disease Clinic DIAGNOSIS: 1. Myotonic Dystrophy. 2. Asphyxia of the newborn. 3. Intraventricular hemorrhage as a newborn with post-hemorrhagic hydrocephalus, shunted. 4. Retarded development. 5. Secondary pulmonary disease of a moderate to severe degree. 6. Respiratory insufficiency while asleep. "
State's Exhibit E.
In Dr. Nelken's opinion, the mother is of borderline intelligence, also suffers from myotonic dystrophy and would have difficulty raising a normal child. There is no possibility that she can be trained to handle this child's complex problems, (Id. p. 3). The mother receives a Social Security disability benefit.
Dr. Anthony Campagna, Ph.D., met with the mother in January, 1990, for evaluating her and concluded that she lacked the necessary intellectual, emotional and neurological abilities to enable her to learn and appropriately apply the necessary skills to care for her son, (State's Exhibit A).
The mother's IQ was determined to be 65 which the Commissioner concedes is within the mentally defective range. To quote Dr. Campagna's conclusion,
 "Based on my professional training and clinical experience, it is my opinion that Belinda Dafney's neurological, intellectual and emotional difficulties represent longstanding chronic problems which Belinda tends to deny and for which she has largely refused necessary long-term treatment. Even if Belinda immediately acknowledged her need for a comprehensive rehabilitation program addressing psychological, behavioral and emotional programs, it is my professional opinion that she will not be able to accomplish those goals quickly enough to meet Robert's needs for a stable, predictable, and appropriate developmental milieu. It is my opinion that the child Robert Dafney's best interests will be met by terminating the parental rights of his mother, Belinda Dafney, and freeing him for adoption by his current foster family.
In other-words, the mother cannot learn to provide the necessary CT Page 1444 child care because of her own severe limitations, and the court concludes that, for reasons beyond her control, the mother cannot care for her severely handicapped child.
The present Termination of Parental Rights petition alleges that the child was found in a prior proceeding to have been neglected or uncared for and that the parent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. A second ground relied on is that there is no ongoing parent-child relationship as defined by law.
The Commissioner need prove one ground set forth in Section 17-43a(b), General Statutes; In re Juvenile Appeal (84-BC), 194 Conn. 252,258; and that such termination is in the best interests of the child, In re Nicolina T., 9 Conn. App. 598, 602, by clear and convincing evidence, Practice Book Section 1049.
The Commissioner's brief recites the following with which the respondent takes no issue:
 "1. Robert Dafney was born on November 3, 1986.
 2. Robert was born a multi-handicapped child suffering from brain hemorrages and myatonic dystrophy. (State's Exhibits C, D, E and F).
 3. Robert is a medically involved child. He has a trachea tube and spends several hours a day on a ventilator to assist him in breathing. He is fed through a surgically inserted G-tube. (Testimony of Dr. Samson, Testimony of Nancy Orsi, State's Exhibits C, D, E and F).
 4. Marion Cooksley, DCYS social worker, transported mother to see Robert while he was at Yale-New Haven Hospital. (State's Exhibit J).
 5. Mother was not available to hospital staff. The hospital staff was unable to reach mother to obtain permission for Robert's surery. (State's Exhibit J, Testimony of Nancy Wilcox).
 6. DCYS attempted to assist mother in filing for AFDC benefits. Mother refused to file for CT Page 1445 AFDC benefits because it meant her boyfriend had to move. (State's Exhibit L).
 7. DCYS attempted to help mother keep her apartment, but mother did not cooperate. (State's Exhibit L).
 8. DCYS offered to discuss services with mother, but she did not show up for her appointment. (State's Exhibit L).
 9. In October 1988, mother's whereabouts were unknown to DCYS. She had not visited with Robert in the six months preceding the review in October 1988. (State's Exhibit P).
 10. Mother had not been cooperating with those who offered assistance in parenting skills. (State's Exhibit Q).
 11. Mother continues to list her address as 42 Pine Street, Waterbury, CT. This apartment is a relative's apartment. (State's Exhibit S).
 12. Mother visited with Robert three times in 1986, five times in 1987, one time in 1988 and three times in 1989. (Testimony of Nancy Wilcox).
 13. Mother visited with Robert three times at his foster home. (Testimony of Nancy Orsi).
 14. DCYS offered to provide transportation for mother to visit Robert Dafney. (Testimony of Nancy Wilcox).
 15. On March 13, 1989, mother spoke with Nancy Wilcox on the phone. Mother did not request visitation. (Testimony of Nancy Wilcox).
 16. On April 18, 1989, mother spoke with Nancy Wilcox on the telephone. Mother did not request visitation. (Testimony of Nancy Wilcox).
 17. On May 15, 1989, mother spoke with Nancy Wilcox on the telephone. Mother did not request visitation. Mother admitted she last CT Page 1446 saw Robert in December, 1988. (Testimony of Nancy Wilcox).
 18. Mother requested a visit with Robert in December 1989. DCYS arranged a visit for December 22, 1989 at the foster home and offered to transport mother to the Orsi home. Mother was to meet the social worker at the Waterbury DCYS office. Mother did not show up at the Waterbury DCYS office. (Testimony of Nancy Wilcox).
 19. Mother wishes to have Robert at home with her. (State's Exhibit S, Testimony of Belinda Dafney).
 20. Mother does not recognize the need for support services for herself or for Robert. (Testimony of Dr. Campagna, State's Exhibit A).
 21. Mother is of borderline intelligence. Her limited intelligence impacts negatively on her ability to care for Robert. (Testimony of Dr. Campagna, Testimony of Dr. Nelken, State's Exhibits A B).
 22. Robert is constantly at risk of infection and requires careful monitoring. (Testimony of Dr. Samson, Testimony of Nancy Orsi, State's Exhibits C, D, E and F).
 23. Mother has been unable to care for Robert and there is no possibility that she will be able to care for him in the future. (Testimony of Dr. Campagna, Testimony of Dr. Nelken, State's Exhibits A and B).
 24. Robert was placed with Nancy and Ray Orsi on April 10, 1989. (Testimony of Nancy Orsi, State's Exhibit S).
 25. The Orsis have extensive experience in parenting multi-handicapped children. (Testimony of Dr. Samson, Testimony of Nancy Orsi).
 26. Dr. Samson has been Robert's pediatrician for two years. Dr. Samson has visited Robert in the Orsi home. (Testimony of Dr. Samson). CT Page 1447
 27. Robert made significant improvements after he was placed with the Orsi family. Robert is able to recognize the adults who care for him and misses them when they are not present. Robert is affectionate with his foster mother, Nancy Orsi. (State's Exhibits C, D, E, F and R, Testimony of Nancy Orsi).
 28. Robert does not recognize his biological mother. (State's Exhibit B).
 29. Robert does not recognize his biological mother. (State's Exhibit B).
 30. The Orsis are excellent foster parents and advocates for Robert. (Testimony of Dr. Samson, State's Exhibit S).
 31. The Orsi family is capable of meeting Robert's medical needs. (Testimony of Dr. Samson, Testimony of Nancy Orsi).
 32. The Orsi family would like to adopt Robert, if the court grants the petition to terminate parental rights. (Testimony of Nancy Orsi).
 33. The Orsi family would allow mother visitation if they were permitted to adopt Robert. (Testimony of Nancy Orsi)."
The mother complains that DCYS did not work toward reunifying her with the child, cf. State's Exhibit J, L and N, periodic treatment plans. As early as the September, 1988 treatment plan, it was the intention of DCYS to plan
 ". . . for termination of parental rights if adoption is feasible by 12/89." State's Exhibit P.
The court finds that it would have been futile to attempt a unification in view of the mother's limitations and the child's multiple handicaps. The conclusion that the mother's own deficiencies interferes with her parenting functions so that she is rendered unable to provide the child with necessary care has been held to be a sufficient factual basis to support termination, In re Nicolina T, 9 Conn. App. 598, 605.
The fact that the mother is incapable of bringing about any degree of personal rehabilitation because of her limitations does not CT Page 1448 temper the holding, In re Juvenile Appeal (83-BC), 189 Conn. 66,78-79.
The mother cites In re Migdalia M., 6 Conn. App. 194 in support of her position. In that case the parents limitations
 ". . . lie in their inability to care for a seriously ill child." Id., p. 205
That case also points out that the personal rehabilitation expected of a parent is not necessarily the same thing as a full time caretaker, and the statute does not require that
 ". . .a parent must either assume a full time responsibility for a child's care, or suffer a termination of parental rights." Id., p. 206
However, there must be some conscious effort on the part of the mother in this case to adjust her behavior, to display love for the child,
 ". . . consistently express an interest in the child's welfare, and periodically visit with the child committed to foster care, . . . ."
Id., pp. 207-208.
The evidence in this case demonstrates that Belinda D. has not demonstrated any consistent interest in Robert's welfare, either by regular visits or even by telephone inquiry to request such visits.
It is also noted that In re Migdalia M. was decided by application of the statute before it was amended by Public Acts 1983, No. 83-478 which added a "reasonable time" limitation to the expected rehabilitation of the parent.
The other consideration is the child's best interests. The nature of the constant care this child must continue to receive will not be affected by the termination of the mother's rights. This child has been hospitalized for a major portion of his life and, when not so confined, requires constant specialized care. Dr. Nelken's recommendation is that permanent adoption by the present foster parents is needed to assure that
 "he will have the stability of care and protection he will need for the rest of his life, in an environment which promises to provide him with the support and stimulation most likely to elicit the highest developmental achievements of which he may become capable." CT Page 1449
Although considerations concerning adoption come later, after termination, it is undisputed that this child will continue to need constant care for the foreseeable future.
The hospital reports in The John Dempsey Hospital records indicate that Robert is making slow but continuous progress and will continue to need home based PT (physical therapy), OT (occupational therapy), speech and educational therapy, State's Exhibit C. The court concludes that it is in the child's best interests that his mother's rights be terminated.
The second ground alleged by the Commissioner to support termination, no ongoing parent-child relationship, as defined in Section 17-43a(b)(4), General Statutes, contemplates an ongoing parent-child relationship that "ordinarily develops", resulting from "a day to day basis". This situation involves an exceptional child, a mentally deficient parent, and great medical effort to keep the child alive, (cf. State's Exhibits C, D, E and F). The child has received constant, continuing care since birth. The mother never had the opportunity to form an ongoing relationship because of the multiple disabilities of the child, nor does she have the capability to care for Robert. There is little proof that Robert knows those to whom he responds, and no proof that he discerns the relationship of any other person.
This court declines to find that this second ground has been proven by clear and convincing evidence.
The court makes the following written findings:
(1) The reunion of parent and child in this case was and is impossible and any such attempts by an agency would be futile.
(2) There were no court orders and no agreements.
(3) The child has some emotions expressed toward his foster parents. There are no feelings of the child nor are there any apparent emotional ties of the child toward his mother.
(4) The child is now 3 years 9 months old.
(5) The mother has maintained sporadic contact with the child but, as observed in (1) above, it is impossible for this child to reside with his mother.
(6) No unreasonable acts or conduct took place to prevent the mother from maintaining a meaningful relationship with the child.
The Commissioner shall report to the court within ninety days on CT Page 1450 a case plan as provided by statute.
HARRIGAN, JUDGE