[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE AND HISTORY OF PROCEEDING CT Page 3653
Jacob M., whose date of birth is July 6, 1986, is the subject of petition, filed by his father, John M., to terminate the parental rights his mother, Carmon D., pursuant to Section 45-61 of the Connecticut General Statutes.
The petition was originally filed in the Court of Probate for the District of Marlborough on July 15, 1988. It was transferred to this court upon motion of the respondent mother on November 16, 1988. An amended petition was filed with the court on August 2, 1990 alleging three grounds for termination: abandonment, (2) no ongoing parent-child relationship, and (3) acts of commission or omission. A trial was conducted on August 20, and 22, 1990 and was concluded on October 11, 1990.
On August 22, 1990 the petitioner and respondent agreed, on the record, and with the approval of the court, that mother be permitted to visit with the child under the supervision of a third party. On September 20, 1990 the petitioner filed a Motion to Suspend Visitation alleging that such visits would not be in the best interest of the child, and on September 24, 1990 the respondent filed a motion for Contempt alleging that father has refused to permit visitation. The motions were heard by the court on October 11, 1990, the last day of trial. Both motions have been denied by the court in light of its decision concerning the termination of parental rights petition, infra. Trial briefs were filed by the parties on October 25, 1990.
FACTS
The testimony presented and the exhibits received during the course of the trial support the finding of the following facts by the court.
On July 6, 1986, John M. and Carmen D., who had resided together in in the town of Marlborough, Connecticut since 1978, produced a child, Jacob, who is the subject of this petition. Carmen had experienced problems with alcohol abuse prior to the birth of Jacob; however, she did not consume alcohol for the three months immediately prior to the birth of the child nor for approximately three months subsequent to Jacob's birth. Sometime after October, 1986 mother returned to work and again began drinking, often to the point of intoxication.
Thereafter, the relationship between Carmen and John steadily deteriorated and was punctuated with arguments, police involvement resulting in arrests of both parties, periods of intoxication by Carmen, and separations where Carmen would leave for a period of time and then return home. Father testified that he observed a parent-child relationship between mother and child, but at times mother was inattentive. This general situation continued until September 19, 1989 when, after selling his house, father took Jacob and moved out of state. CT Page 3654
During all but one of these separations Jacob remained with the father. The one exception was in November, 1987 when Carmen took Jacob with her to her father's home in New Britain. Several days later John received a telephone call from the New Britain police telling him that they had Jacob and requested that he take the child home. Carmen, while intoxicated, had become involved in an altercation with her father, resulting in police intervention. Carmen, was thereafter hospitalized because of her intoxication and alcoholic condition and thus was unable to care for Jacob. There was no evidence that Jacob was harmed or in any physical danger on that occasion.
Father testified that there were occasions when Carmen "passed out" due to her drinking when she was alone with Jacob. However, father also stated that he never left Carmen alone with Jacob.
The petitioner presented evidence of several acts by mother which he felt placed Jacob in danger. One was an accidental fire of some facial tissue on a night stand, caused by mother when she fell asleep, or passed out, on her bed with a lit cigarette. Father said that the house was filled with smoke but he did not call the fire department. The court finds it difficult to accept father's description of the incident as being as serious as was suggested by father given the fact that only facial tissue were involved and the fire was not deemed worthy of a call to the fire department. Father also complained that Carmen sometimes took the child into the shower with her. However, there is not credible evidence that the child was harmed or endangered in any way as a result of these acts by mother.
Alice Purzycki, a neighbor of John and Carmen observed Carmen intoxicated on numerous occasions. She also heard arguments and fights between Carmen and John, and often the child was present and was upset. She testified that Carmen once made a suicide threat but she could not state that there was actually a suicide attempt.
Mrs. Purzycki testified that Jacob called Carmen, "mommy", that he appeared to love his mother, and that Carmen treated Jacob in a loving manner. Jacob always appeared to be well tended to, clean, well fed, and healthy.
Angie Markham testified that she has known John and Carmen for about two years. Carmen moved in with Ms. Markham for about eight months from October, 1988 until June, 1989. Carmen had visits with Jacob at Ms. Markham's house when John would permit it, sometimes once per week. Carmen did have a drinking problem but tried to see Jacob as often as possible. She observed Carmen and Jacob during the visits and thought the visits went well.
On September 19, 1989 father took Jacob and moved out of state. He resided at various campgrounds in New York and Massachusetts over the next year. Father did not contact or communicate with Carmen CT Page 3655 again until June, 1990, even though he returned to Connecticut on several occasions during that period of time. John received messages from Carmen from time to time but did not attempt to contact her until June, 1990.
Carmen made repeated efforts to locate John and the child from September 1989 until June, 1990, without success. She contacted John's sister on several occasions as well as Violet Schwartzmann, the Town of Malborough welfare official, on three occasions in an effort to locate Jacob.
Both Ms. Markham and Ms. Schwartzmann testified that father told them that he wanted to have Carmen's parental rights terminated and then he planned to voluntarily terminate his own parental rights and give Jacob up for adoption. He stated that he wanted to get on with his own life. The court finds this testimony to be credible.
In June, 1990, after an absence of almost nine months, John contacted Carmen and permitted her to see Jacob for a visit at a park in Manchester, Connecticut. Jacob interacted well with Carmen, enjoyed the visit, and called his mother "mommy". Father has not permitted Carmen to see Jacob since that single visit in June.
On August 22, 1990 the parties agreed, and the court ordered, that mother be permitted to visit with Jacob in a neutral setting under the supervision of a third party. As of the final day of trial on October 11, 1990, that agreement has not been followed by father.
The court finds by a fair preponderance of the evidence that since September, 1989 father has removed Jacob from Connecticut and has unreasonably and deliberately kept the child from mother. With the exception of a single visit in June, father has prevented her from seeing her child.
CLINICAL EVALUATION:
On March 1, 1989, Dr. Robert Meier, a licensed clinical psychologist, conducted a court ordered psychological evaluation on mother, father and child. He found evidence of a parent-child relationship between Carmen and Jacob. "Mother seemed to be generally knowledgeable of his developmental progress, noting that there were some delays in speech. . . . She did seem to genuinely care about the child, and the child did go to mother to meet needs for comfort and support during the session."
Dr. Meier found it difficult to address the question of termination of mother's parental rights. In that regard he listed several options but made no clear recommendations other than limiting mother's involvement with the child until she came to grips with her substance abuse problems, and limiting father's involvement with mother. CT Page 3656
(Petitioner's exhibit A).
Two social studies were prepared for the court in this case. The first was written on December 22, 1988. Two paragraphs contained within that report sum up the situation as it existed in December, 1988, and are reproduced for emphasis. (Petitioner's exhibit B)
 It appears unlikely that [father] will end all contact with [mother], and a termination of her rights would give him immense power over her, which he may abuse, despite his concern for Carmen.
 Mother's substance abuse history however gives little hope that she will be available to parent Jacob. At this point in his young life, a stable home is crucial, and a termination of her rights would strengthen [father's] ability to provide this stability.
The second social study was prepared for the court on October 9, 1990, two days before the conclusion of the trial. The findings of Ms. Kirouac, a DCYS social worker for 24 years, is that there has been a positive transformation in mother since she was seen two years ago.
(Petitioner's exhibit C).
 [Mother] appears to have made considerable progress over the past two years in her attempt to rehabilitate. There has been dramatic improvement in her living situation, physical and emotional state and general attitude since D.C.Y.S.'s initial contact with [mother] in March of 1988. . . . it was [mother's] present appearance, attitude and living environment that most dramatically illustrated the progress she has made. She has gained weight and appears healthy, is enthusiastic about her relationship with Mr. Ortiz and their plan to rent an apartment of their own and likes her present employment. More importantly she appears comfortable in the Hispanic family of her fiance.
ADJUDICATION: as of 8-2-90, the date the petition was last amended.
"Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to statutory standards." In re Migdalia M., 6 Conn. App. 194,203 (1986).
ACTS OF OMISSION OR COMMISSION:
In order to terminate mother's parental rights on the ground of acts of commission or omission the court must clearly and convincingly find that the child was denied the care, guidance or control necessary for CT Page 3657 his physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the mother. (Emphasis added.). Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267 (1984).
The testimony of both the petitioner and the respondent concerning specific acts of commission by mother, i.e., taking a shower with the child, the facial tissue fire, etc., which allegedly took place between one and two years ago, have not convinced the court clear and convincing proof that the child was denied any necessary care, guidance or control by mother as a result of those specific acts. Indeed, it is not at all clear from the conflicting testimony of the petitioner and respondent exactly what happened on those occasions. The court does not find father's testimony to be completely credible in his description and assessment of the incidents. There is no persuasive evidence that the child was ever physically harmed.
The thrust of the petitioner's claim concerning acts of omission by mother have to do with her alcoholism and the effect that has had upon the child. The difficulty with this position is father's testimony that with the exception of three days over the past two years he has never allowed mother to be alone with the child. Since father has been the primary caregiver of the child, and has not allowed mother to care for the child alone, it is illogical for father to allege that Jacob has been denied the care, guidance or control necessary for his physical educational, moral or emotional well-being as the result of acts of omission by the mother. Jacob appears to have been well cared for by father, and there is no evidence that he has suffered the deprivation of any necessary care. (Emphasis added). There is no credible evidence concerning the effect, if any, mother's alcoholism has had upon the child. Dr. Meier's evaluation of March, 1989 was conducted almost one and one half years before the filing of the amended petition and the beginning of trial in this matter. He did not find any negative effect upon the child at that time.
The court finds that the petitioner has not proven this ground for terminating the parental rights of mother by clear and convincing evidence.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an:
 ". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." CT Page 3658
When Dr. Meier evaluated mother and child in March of 1989 he concluded that there was an ongoing parent-child relationship in existence. When mother was permitted by father to visit with Jacob in June of 1990, the child recognized his mother, called her mommy, and generally had a good time with her. While it is true that this relationship is not that which would normally develop as the result of mother having met on a day to day basis the physical, emotional, moral and educational needs of the child, that situation is not the result of mother's lack of interest in the child but rather father's unreasonable act of preventing mother from seeing the child over the past year.
According to the observations of Ms. Kirouac, mother has made dramatic progress over the past year. There is every reason to believe that under these changed circumstances and conditions she will be able to re-establish a meaningful relationship with her son, if given the opportunity to do so. Consequently, the court finds that it is in the best interest of the child to allow further time for the re-establishment of such parent-child relationship with mother.
The court finds that the petitioner has not proven this ground for terminating the parental rights of mother by clear and convincing evidence.
ABANDONMENT:
Section 17-43a(b)(1) of the Connecticut General Statutes defines abandonment as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred." In Re Rayna N., 13 Conn. App. 23, 36 (1987).
There can be no statutory abandonment where the reason for a parents failure to visit or interact with her child is because she has unreasonably been prevented from doing so. In this case the court finds that mother was deliberately and unreasonably prevented from visiting and interacting with her child by the child's father. The court also finds that mother expressed a reasonable efforts to locate her son during the period of time father had removed Jacob from the State of Connecticut, and that father made no effect to notify mother of the child's whereabouts during that time.
The court finds that the petitioner has not proven this ground for terminating the parental rights of mother by clear and convincing evidence. CT Page 3659
DISPOSITION: as of October 11, 1990, the last day of trial.
The gravamen of this case is whether a petitioner who has deliberately and unreasonably separated a respondent from her child during the one year immediately preceding the filling of an amended termination petition can thereafter successfully claim that the respondent has no ongoing parent-child relationship and has abandoned the child, using as the basis of those allegations the fact that she has not seen the child during that period of time.
Not only did father keep the child separated from his mother for almost a year prior to the time of trial, but even after entering into a agreement with the respondent, and the court, to allow mother to have supervised visits with the child during the pendency of the trial and while awaiting the decision of the court on the termination petition he refused to abide by his own agreement. Only a subsequent court order and the threat of being held in contempt of court persuaded him to keep his agreement. Clearly the petitioner must not, and will not, be permitted to take advantage of his own unreasonable conduct.
Even if the petitioner had proven one or more grounds for terminating the parental rights of mother, he has not proven by clear and convincing evidence that it is in the best interest of the child to terminate mother's parental rights. Indeed, given mother's marked improvement in appearance and attitude, and taking into consideration father's conduct and the statements of father that his intent is to terminate mother's parental rights so that he can place Jacob in adoption, the court finds that it is clearly not in Jacob's best interest to terminate the parental rights of mother.
Consequently, for the reasons stated, the petition to terminate the parental rights of Carmon D., in and to her son Jacob M., is DENIED and the petition is DISMISSED.
Terence R. Sullivan, Judge