[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Joey E., whose date of birth is August 30, 1983, is the subject of a petition to terminate the parental rights of Rosalie V., his mother, and Fernando E., his father. Joey was adjudicated to be a neglected child, and was committed to the custody of the Commissioner of the Department of Children and Youth Services ("DCYS"), on June 30, 1980. That commitment was extended by the court for an additional period not to exceed eighteen months effective December 30, 1989. Joey has been in foster care for more than two years.
DCYS initially filed the termination of parental rights petition on February 14, 1990 alleging the grounds of failure to rehabilitate and acts of commission or omission as to both parents. The petition was amended, with the permission of the court, on July 5, 1990 to add the grounds of abandonment and no ongoing parent-child relationship, as to both parents.
A trial was conducted on October 24, 1990. The respondent father was present and represented by counsel at the trial. The respondent mother was not present, although she had been notified of the trial date, she was, however, represented by counsel.
FACTS
Evidence offered at trial, interpreted in the light of the prior record CT Page 4186 in this court concerning this child of which the court has taken judicial notice, permits the finding of the following facts:
DCYS first became involved with Joey in November, 1987 when mother was incarcerated in the Connecticut Correctional Institution at Niantic. The child had been left with the maternal grandfather who was the subject of a DCYS investigation for alleged abusive behavior toward two of Joey's cousins. On January 21, 1988 DCYS filed a neglect petition and Joey was voluntarily placed with a maternal aunt.
On February 24, 1988, mother was transferred from Niantic to the New Perception House in Wilimantic for a 45 day drug treatment program. On April 2, 1988 she left the New Perception House without permission and took Joey from her sister's home. Mother was subsequently located at her parent's house where she was taken into custody and returned to Niantic to complete her sentence, Joey was adjudicated to be neglected and was committed to DCYS on June 30, 1988.
In August, 1988 mother was provided with a treatment plan in which DCYS outlined the goals she must reach before she could be reunified with her son. (Exhibit #2). She was expected to complete her sentence, continue treatment for heroin addiction, and provide the child with a safe home and environment upon her release from prison. During mother's incarceration DCYS transported Joey to the Niantic facility once per month for visits with mother and arranged for weekly telephone calls between mother and child. The child looked foreword to the visits and was strongly bonded with mother at that time.
Mother was released from the correctional institution on March 11, 1989. She thereafter granted all day visits with Joey on Saturdays and Sundays with the condition that the child was not to visit in the grandfather's home because of suspected child abuse by grandfather. A treatment plan was prepared on May 1, 1989 and communicated to mother. In that plan mother was again expected to continue treatment for her addiction and locate a house or apartment separate from her parents. (Exhibit #6).
DCYS subsequently discovered that mother had been bringing Joey to the grandparents home during her weekend visits. Consequently, in July 1989, DCYS suspended her unsupervised visits with Joey. She was, however, permitted to have supervised visits in the foster home, without restriction as to the number of visits.
Ms. Burk-Buckler, the DCYS social worker assigned to Joey's case in October, 1989, testified that between October, 1989 and June, 1990, mother visited with Joey a total of six times. Three of the visits were in December, 1989 and three in April, 1990. One of the December visits was only for five minutes. CT Page 4187
Service agreements were entered into between mother and DCYS in December, 1989 in which mother agreed to visit with Joey at least twice a week, maintain contact with DCYS, call her social worker every Wednesday, secure employment and suitable housing, and complete a drug evaluation. (Exhibits #11 and #12). Mother did not successfully satisfy any of the terms of the agreement, except she did undergo a drug evaluation in August, 1990. Her only known employment was at a fast food restaurant for a period of from four to six weeks. She did not visit regularly with Joey even though she had transportation available to her, and her residence is and has been unknown to DCYS because mother has not been in communication with that agency. Mother has not inquired of her DCYS workers about the health, education, or general welfare of her son over the past year.
The child's current foster mother, Maria Mateo, has cared for Joey since June 8, 1989. Ms. Mateo testified that mother visited Joey weekly during the months on July and August, 1989, twice during September, 1989, and then only five times thereafter. Mother has not called the child on the telephone nor sent him any letters. She has never inquired of the foster mother about Joey's welfare, education or health. The court finds Ms. Mateo's testimony to be credible.
Father was arrested and convicted for Sale of Narcotics in 1985, when Joey was two years old. He was sentenced to serve 7 years, execution suspended suspended after 4 years, and in fact served 30 months of that sentence. In 1987 he was arrested again for Possession of Narcotics. He posted bond and in January, 1988 fled to California where he remained for approximately eleven months before being extradited to Connecticut. He was thereafter convicted and sentenced to serve five years;; however, he was placed on supervised home release in October, 1989. (Exhibit #14A).
DCYS had no contact with or communication from father between January, 1988 and approximately July, 1989, a period of about eighteen months. DCYS arranged for monthly visits between Joey and his father at the correctional facility in July, 1989 when it was learned that Fernando was incarcerated in Connecticut. In addition, father had weekly telephone calls with Joey while incarcerated during the period of July to October, 1989.
On December 15, 1989 father entered into a six week service agreement with DCYS. For the most part he successfully satisfied his part of that agreement.(Exhibit #13). However, he was only out of prison for approximately four months before being re-incarcerated for a new criminal offense.
Father is currently incarcerated in the Connecticut Correctional Institution at Enfield where he is serving a sentence imposed on February 14, 1990 of fifteen years. That sentence is to be suspended after he serves nine years and will be followed by probation. By his own CT Page 4188 calculations, father's estimated release date is in December, 1996, and he will not be eligible for either parole or supervised home release until 1993, at the earliest.
Father had two visits with Joey at the Brooklyn Correctional Center in March and April, 1990. The first visit was held in a day room and went well. The second visit was held in the more restrictive inmate visiting room. Joey became frightened of this environment and had to be comforted and reassured by father. Father had indicated that he does not want Joey to visit him in the Enfield Correctional Institution where he is currently incarcerated. He believes that it would not be in the child's best interest to expose him to this type of environment. With the exception of the court ordered psychological evaluation in September, father has not seen the child since approximately April, 1990.
CLINICAL EVALUATION:
Psychological evaluation of mother, father and child were ordered by the court. The evaluation of father and child was conducted by Dr. David Mantell, a licensed clinical psychologist, on September 5, 1990. Mother did not appear for nor participate in the evaluation. The court finds Dr. Mantell's report and testimony to be credible and attaches great weight to his observations and opinions. In re Nicolina T., 9 Conn. App. 598, 605
(1987).
Dr. Mantell observed a warm and spontaneous relationship between father and child, despite the fact that it had been some time since father and son had last seen each other. Dr. Mantell's report clearly reveals a great deal of love between Joey and his father. Yet, Joey stated to Dr. Mantell that he has never known a father. Joey has a warm feeling for his mother but finds it too painful to talk about her. Dr. Mantell indicted that the foster other is the child's psychological parent. (Exhibit #1).
During the evaluation, father admitted to having a long history of drug abuse and involvement with the criminal justice system. He stated that he has neglected his parental responsibilities and indicated that he expected to have his parental rights terminated because he cannot provide a home for his son. Dr. Mantell testified that he will be unable to determine whether father will change his pattern of behavior and develop parenting skills until after his release from prison. As of now father's ability to parent is limited by his antisocial personality disorder. Dr. Mantell expressed the opinion that it will take at least one year following father's release from prison to determine whether he can establish himself as a drug free, law abiding citizen in the community, and then from one to two years of active contact with Joey to determine whether he can develop the ability to discharge a full range of parenting responsibilities. He expressed that opinion that, given father's history recidivism is more likely than rehabilitation in CT Page 4189 father's case.
Dr. Mantell indicted that additional time in foster care will be harmful to Joey. Waiting for permanency has the effect of denying the child a sense of certainty as to his parents and delays the bonding process. After a period of time the question of permanency begins to overshadow all other aspects of the child's life. The child develops unrealistic and unfilled expectations which result in an arrest of emotional growth. The child can suffer from social and emotional immaturity with negative implication throughout the life of the child.
A portion of Dr. Mantell's report (Exhibit #1) is reproduced for emphasis.
 The child should not be allowed to live with the biological parents unless they are available in the near future to assume a major role in the child's life and have also shown themselves to be substantially rehabilitated from their past patterns of substance abuse and criminal behavior. They should also show themselves to be generally stable and capable of responsible parenting.
 Based on the information available, it might not be possible for the child to live with either biological parent until the parents have rehabilitated and the child has reached his 18 (sic) year of life.
ADJUDICATION: as of 7-5-90, the date the petition was last amended.
"Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to statutory standards." In re Migdalia M., 6 Conn. App. 194,203 (1986).
ACTS OF OMISSION OR COMMISSION:
In order to terminate the parental rights of mother and/or father on the grounds of acts of commission or omission under Section 17-43a(b)(3) the Court must clearly and convincingly find that the child was denied the care, guidance or control necessary for his physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the mother. (Emphasis added.).
Without proof of deprivation of care, this ground cannot be found. In Re Juvenile Appeal, 192 Conn. 254, 267 (1984).
The court finds that the petitioner has not proven this ground as to either mother or father by clear and convincing evidence. There is no clear proof that Joey has been denied any necessary care guidance or control by the act of either parent. The evidence that the child is sad CT Page 4190 and finds talking about his mother to be a painful experience does not raise to that level of proof. Indeed, there is strong evidence that he has been receiving excellent care at the hands of Ms. Mateo over the past year. Ms. Burk-Buckler found Joey to be ". . . a delightful child who feels safe and secure in his current environment." (Exhibit #14C).
ABANDONMENT:
Section 17-43a(b)(1) of the Connecticut General Statutes defines abandonment as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment had occurred." In Re Rayna N., 13 Conn. App. 23, 36 (1987).
MOTHER:
The court finds that the petitioner has proven by clear and convincing evidence that mother has abandoned this child, as that term is defined by statute. The court also finds that this condition has existed for more than one year. However, even if the one year requirement had not been satisfied, a waiver of that time requirement is warranted as being in the best interest of the child under the totality of the circumstances.
Mother visited with Joey approximately fifteen times from June, 1989 until July, 1990. There were only six visits in the eight months immediately preceding the filing of the amended petition, three of which were in December, 1989 and three in April, 1990. One of the visits in December, 1989 was for only five minutes.
Mother has neither inquired about nor expressed concern for her son's health, education or general well-being with either DCYS or the foster mother during most of the child's commitment. Her lack of foster mother during most of the child's commitment. Her lack of interest in the child and his well-being is evident in her failure to attend the court ordered psychological evaluation and her failure to attend the termination of parental rights trial. Mother's minimal contact with her son over the past year and her lack of concern or expression of interest in his well-being, is clear and convincing evidence that she has filed to maintain a reasonable degree of interest or concern in the child.
FATHER:
The court finds that the petitioner has proven by clear and convincing evidence that father has abandoned his son, as that term is defined by statute, and that this condition has existed for more than CT Page 4191 one year.
The issue is not whether Fernando loves his son or whether Joey loves his father, rather the question is whether father has maintained a reasonable degree of interest, concern or responsibility as to the welfare of this child. Clearly and convincingly he has not done so.
Joey is seven years old. His father has made no effort over the past five years to provide the child with a nurturing, loving, secure, permanent home or environment, nor has he provided any real care for Joey since the child was two years old.
Father was not involved with the child's care or welfare for two and one half of the child's most formative years. Even after being released from prison in 1987, rather than attempting to care and provide for his son, he again turned to criminal activity resulting in his arrest and ultimate incarceration and separation from Joey.
In January, 1988, when Joey needed his father the most, at a time when his mother was incarcerated and he was living with a grandfather who was suspected of child abuse, at a time when he was being placed in foster care, father's response to his son's needs was to abscond to California where he remained for eleven months. During that time and for approximately 18 months he did not even contact DCYS to enquire about the health, well-being or welfare of his son. That is not, by any stretch of the imagination, maintaining a reasonable degree of interest, concern or responsibility as to the welfare of the child.
Father's concern has been for himself, not for the child. He has been interested in the child, not when the child needed him, but when it was convenient for father. The only time he has shown any sustained interest in contact with Joey over the past five years was during the few months subsequent to his release from prison 1987, before he fled to California, and for approximately four months from October, 1989 to February, 1990, again in between prison sentences. Father has, by his own choice, seen the child twice since February, 1990.
The court finds clear and convincing evidence that father has abandoned his child, not because of his incarceration, but because his choice has been to be involved in a life of criminal and anti-social behavior rather than a life with and for his son. This constitutes a conscious disregard for his parental obligation to his son, and is demonstrative evidence of father's lack of concern for the welfare and well-being of this child.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an: CT Page 4192
". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child[ren] and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child[ren]."
MOTHER:
The court finds that there has been insufficient evidence produced during the course of the trial to determine whether a parent-child relationship exists between mother and child. Consequently, the court finds that the petitioner has not proven this ground by clear and convincing evidence.
FATHER:
The evidence presented to the court reveals a strong bond between father and child. Joey has positive feelings towards his father and their interaction during the evaluation observed by Dr. Mantell was warm and healthy. The court finds that the petitioner has failed to prove by clear and convincing evidence an absence of a parent-child relationship between father and the child.
The petitioner states in her brief (p-25) that Dr. Mantell testified that no parent-child relationship exists between the child and either of the respondent parents. If that was Dr. Mantell's testimony, the court rejects said testimony as being inconsistent with the clinical evaluation found in Dr. Mantell's written report (Exhibit #1) and other testimony of Dr. Mantell as to father. Since Dr. Mantell never evaluated mother nor observed mother and child together, the court does not accept a conclusion that there is no relationship between mother and child.
FAILURE TO REHABILITATE:
Section 17-43a(b)(2) of the General Statutes provides for the termination of parental rights in the situation where a parent of a child who has previously been adjudicated as being neglected fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time said parent could assume a responsible position in the life of the child, considering the age and the needs of said child. Personal rehabilitation refers to the restoration of a parent to his or her former constructive or useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203 (1986).
Joey was adjudicated to be a neglected child and committed to DCYS two years ago, on June 30, 1988. Not only has he been in foster care since his commitment, but he was in foster care for approximately six months prior to the commitment. CT Page 4193
Those same factors which have been articulated by the court in its finding of abandonment, supra, are also grounds for a finding of failure to rehabilitate, as to both parents.
MOTHER:
Mother is no closer to being able to care for or to provide a home for her son now than she was two years ago at the time of his commitment. Even though she has not be incarcerated over the past year she has failed to secure or maintain a suitable residence or source of income so as to be able to provide a home for Joey. She has not kept DCYS advised of her whereabouts and she has not been cooperative with that agency. Mother has not even visited with the child on a regular basis, and indeed her visits have become even less frequent over the past year, with only three visits between January and July, 1990.
The court finds, based upon the totality of the evidence and circumstances, that the petitioner has proven by clear and convincing evidence that mother has failed to rehabilitate and that this situation has existed for more than one year.
FATHER:
Father's situation is a classic example of failure to rehabilitate. He has chosen not relinquished his criminal lifestyle and as a result he has not been available to parent his son when Joey needed him. Even during those brief periods of time when father has been out of prison he has not attempted to provide Joey with a home. He has had little to do with the child over the past five years, and it is difficult to find much at all in his past relationship with his son evincing a useful or constructive parenting role. Loving a child from a distance is not enough to constitute a constructive parenting role.
Based upon father's own calculations Joey will have to wait several years before it can be determined whether father will be able to fulfill a role as a useful and constructive parent. That is too long for the child, given his age and need for permanency, to wait in a state of uncertainty.
The court finds clear and convincing evidence that father has not achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time he could assume a responsible position in the life of this child, considering the age an the needs of the child, and that this has existed for more than one year.
Joey is seven years old and has already been in foster care for more than two years. He needs the certainty and security of a permanent home and permanent caregivers. His mother has shown no interest in filling her parental role, and it is unreasonable for the child to wait any CT Page 4194 longer for a father who has neglected the child for most of his life to decide whether he can or will be a responsible parent.
Pursuant to In Re Shavoughn K., 13 Conn. App. 91, 98 (1987), the court's required findings as to the six factors listed in Sec. 17-43a(d). are as follows:
(1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent.
DCYS encouraged both mother and father to seek treatment for substance abuse. In addition, service agreements were entered into with both parents and visits with the child were arranged and encouraged by DCYS.
(2) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Father attended and participated in the court ordered psychological evaluation. Mother did not appear for her evaluation nor did she appear for the termination trial.
(3) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
There are positive feelings between father and child; however, the foster other is viewed by the child as his psychological parent. Joey has indicated that he has never known a father. There is insufficient evidence to determine whether there is any bond between mother and child.
(4) The age of the child. Joey was born on August 30, 1983.
(5) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child[ren] to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Neither parent has made any significant efforts to alter his or her CT Page 4195 lifestyle so as to be able to provide a home for the child. Mother's contacts with the child have been minimal over the past year. Father continues to be incarcerated and has terminated all visits with his son at the correctional institution, of his own volition. Neither parent has maintained significant contact or communication with DCYS as to the welfare or well-being of the child.
(6) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct or the other parent of the child, or by the unreasonable act of any other person or by the economic circumstances of the parent.
No one has unreasonable prevented either parent from maintaining a meaningful relationship with the child. Economic circumstances have not been a factor in this case.
DISPOSITION: as of 10-24-90, the last day of trial.
The court finds that there have been no significant changes in conduct or circumstances by either parent between the date of the amended petition and the date of trial which would make it possible for the child to be returned to their care in the foreseeable future.
Mother last visited with Joey at his foster home in August, 1990. The last time she saw her son was when she encountered him on the street in September. She did not attend either the court ordered evaluation of September 5, 1990 nor the termination trial. She continues to demonstrate no reasonable interest in her son or his welfare.
Father remains incarcerated. The only time he has seen his son was during a court ordered evaluation on September 5, 1990.
Dr. Mandell estimated that it would take from one to three years after father was released from prison before it could be determined whether he could or would be able to undertake a parenting role with Joey. The child is now seven years old. Father will not be released form prison for another two years at the earliest. That means that the child would be from ten to twelve years old before we would know whether father was willing or able to care for his son. It is not in the child's best interest to be required to wait that long for possible permanency with his father.
The court accepts Dr. Mantell's assessment and opinion that it will be harmful to Joey if he is required to remain much longer in temporary foster care. His need for a permanent, nurturing home is of paramount importance at this time in his life. Maria Mateo, Joey's current foster mother wishes to adopt him and Joey considers her to be his psychological parent. CT Page 4196
The court finds by clear and convincing evidence that it is in the best interest of the child to terminate the parental rights of both; his mother and father, as neither is now nor will be in the foreseeable future able to provide the nurturing, care, and permanency which the child needs.
JUDGEMENT
Having considered the foregoing, and having found that the grounds of abandonment and failure to rehabilitate have been proven by clear and convincing evidence as to each parent, it is further found by clear and convincing evidence to be in the best interests of Joey for the parental rights of both his father and mother to be terminated so that he may be raised in a permanent, secure and nurturing environment as an adopted child.
It is therefore ORDERED that the parental rights of Rosalie V. and Fernando E., in and to Joey E., are hereby terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child forthwith in adoption, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no late than 90 days from the date of this judgement a report as to the progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.
TERENCE A. SULLIVAN, Judge.