MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Ramona B. and the father Michael S. to their daughter Shaitatiana B., now age two. When the petition was initially filed, based upon information provided by the mother, James W. was named the putative father. After Ramona B. told the court ordered psychologist that in addition to James W. there was a Michael S. who she was "with" prior to her pregnancy, The Commissioner of Department of Children and Families (hereafter DCF) on June 29, 1998, amended the petition for termination of parental rights citing Michael S. as an additional putative father.[2] Subsequent to the evidentiary hearing, the named father, Michael S., was located and personally served. He appeared in court on September 9, 1998, at which time the court ordered that an expedited paternity test be performed. On October 14, 1998, the results of that test were returned to court. They indicate that the probability of paternity is 99.9%. DCF has since moved to delete the named putative father, James W., from the petition, which motion the court has granted. Presently the petition naming Michael S., the father, remains.
On May 23, 1996, a Petition alleging neglect and the Termination of Parental Rights was filed in the Superior Court for Juvenile Matters. At that time the court ordered that temporary custody be given to DCF. Subsequently, on November 26, 1996 Shaitatiana was committed as a neglected and uncared for CT Page 12343 child by the court, Foley, J., and the state withdrew the TPR petition without prejudice. Extension of commitment was granted on October 3, 1997, effective November 27, 1997, for an additional twelve months. On December 13, 1997, DCF filed a Petition for Termination of Parental Rights as to Shaitatiana.
The court finds that the mother has been personally served with the petition for termination, has appeared and has a court appointed attorney. Personal service has been made on the named father, Michael S. He has had notice of the pendency of this proceeding and has appeared. The court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court.
By the amended petition the petitioner, DCF, alleges that the grounds for termination of parental rights as to the father, Michael S., are abandonment and lack of an ongoing parent-child relationship. The father has denied the charges. As to the mother, DCF alleges in its petition that after a finding of neglect/uncared for, mother has failed to rehabilitate herself and that the child has been denied by commission or omission the care, guidance or control necessary for her physical, educational, moral or emotional well being. The mother has denied tile charges pending against her.
FACTS
The court having read the verified petition, the social study and the various documents entered into evidence and having heard the testimony of the witnesses, as well as having taken judicial notice of the prior record in this case as to the child, makes the following factual findings and reasonable inferences supported by those facts.
FATHER
As to the father, Michael S., cited in the amended petition, the mother, Romona B., first revealed his name to Dr. Freedman during a follow-up evaluation in connection with the petition for termination of parental rights. She reported that she was "with" both men, James W. and Michael S., before she became pregnant. She claimed that she "didn't want to be bothered" with either man so she had not supplied DCF with adequate information to find them. CT Page 12344
After DCF made a diligent effort to locate Michael S., he was finally found and notice of these proceedings was personally made. He was not present at the evidentiary hearing having first appeared after that hearing was concluded. The petition as to him is still pending.
As Dr. Freedman noted, since mother had shown a marked lack of cooperation in identifying and locating the biological father of Shaitatiana, neither of the two she claimed might be the biological father had never known for certain that this was his child. As a result, this prevented either named father or his extended family from offering care and a home for Shaitatiana.
MOTHER, RAMONA B.
The mother, Ramona B., has had five other children all close in age to one another except for the oldest. Of the five fathers of her children, three were reportedly drug dealers and one used drugs. According to her, some of the fathers never knew they had children since she never told them. Of the fathers that did know, none had an taken active interest or involvement with the child. All of the children have been involved with DCF. Ramona's parental rights were terminated as to all five children and they all have been adopted. The two oldest were adopted by friends of the family, providing Ramona access to them for visits and the other three were adopted by people with whom Ramona has no contact. She reported that her mother had gone to prison on drug charges years before but had not used drugs in many years. Also, apparently her sister had lost custody of her children as well but her parents were now caring for two of the children.
On May 23, 1996, a neglect petition was filed by DCF alleging that Ramona had given birth on May 18, 1996 to her sixth child, Shaitatiana. Ramona admitted that she smoked crack-cocaine at 2:00 a.m. the morning she gave birth. She also indicated that she had had no prenatal care and smoked cocaine at least 2 to 3 times per week during the entire pregnancy.[3] The petition further alleged that Ramona was discharged on May 20, 1996 from Bristol Hospital and on May 21st requested DCF's assistance in getting drug detox hospitalization. She admitted that she could not care for her newborn due to her drug addiction. Mother could not remember the name of her newborn child when asked. She stated that the father's identity was unknown. She was transported and voluntarily admitted to Blue Hills Hospital in Hartford. CT Page 12345
On November 26, 1996, mother entered a nolo contendere plea and the child was adjudicated as neglected and uncared for. She entered into expectations on that date which required continued visitation with the child, drug and alcohol in-patient counseling, no involvement with the criminal justice system, a no substance abuse order, a requirement of adequate income and housing and keeping appointments and whereabouts known to DCF, as well as sign all releases.
Ramona kept most of the appointments that DCF scheduled for her. She missed a court hearing and an administrative ACR. Before she was incarcerated mother had weekly visitation with her child. DCF provided the transportation. Though somewhat consistent with visitation, she canceled five parent/child visits claiming she was ill. DCF canceled several parent/child visits due to the child's illness and the mother never requested that these visits be rescheduled. Monthly visitation with DCF transporting occurred at the prison until it was suspended. Transportation was also provided for mother for court hearings and any appointments or evaluations mother needed to attend concerning her treatment. DCF also supplied mother with pictures of Shaitatiana upon mother's request.
Before Ramona's incarceration in March 1997 she was in an out-patient counseling program at the Bristol Counseling Center. Random drug and alcohol screens were not conducted on her and there was no way to verify that she was substance free. Ramona claims that she became involved with drugs when she was 24 years old. She reports that crack cocaine was her drug of choice. She admits that she has never had any significant substance abuse treatment. DCF requested that mother participate in an in-patient substance abuse program. She was referred to Rushford Substance Abuse Treatment Facility in Middletown. An evaluation was conducted and Rushford recommended that mother enter their in-patient program. Mother was very reluctant about entering the in-patient program and was not cooperative during the evaluation process. She refused to take a random urine screen. She also refused a random urine screen requested by the court. DCF made several referrals to get mother involved in an in-patient program. Referrals were made to Advanced Behavioral Health Inc. for substance abuse evaluation, Rushford as previously indicated, Reich Treatment Center, Guerston Rehabilitative Center and Deucher Hall substance abuse program affiliated with Connecticut Valley Hospital. She was incarcerated before an in-patient program could be further pursued. Ramona states that she has been CT Page 12346 in and out of jail for years.
As regarding the housing expectation, before Ramona was incarcerated she resided with her mother and then moved in with her sister.
As to no involvement with the criminal justice system, mother has not complied with this expectation. She has been in and out of jail and reports that she has been incarcerated five times. Shortly after Shaitatiana was committed to DCF, mother was incarcerated for the sixth time for possession of drugs. She was sentenced to three years incarceration on March 12, 1997.
Ramona testified that while at York Correctional Institution she has completed several programs which are offered to the population. A Certificate of Achievement for the Tier I program was admitted as Respondent's Exhibit B1. This five hour program is designed to identify drug abuse problems. Respondent's Exhibit B2 is a Certificate of Achievement for the Tier II program lasting 30 hours. This program, according to the witness, addressed family and drug abuse issues. The witness also testified she completed and received a Certificate of Achievement for the Family Dynamics program of 15 hours, Respondent's Exhibit B3. She also testified that she actively participated in an AA program and the GED courses which were offered. She also said she would like to be paroled to a halfway house and is looking into a child parent program. Upon cross examination, she admitted that at the present time she cannot provide a home for her child and that there is no guarantee that she will be admitted into a parole program.
As Dr. Freedman concludes in his report, Exhibit 2, even though Ramona is currently drug free she seems to have managed to avoid drugs and drug related people and places only while in prison. Even if she was to transfer to a drug treatment halfway house and remain there, this would probably mean that she would be in this program for 6-12 months before she would be ready for release, assuming everything went perfectly according to plan. This would mean that the child would be roughly 3 years old when mother was released and ready to start her life. However, mother has not worked in 10 years and has a poor record of remaining drug free outside of prison. She would have to overcome many obstacles and potential pitfalls in her rehabilitation. Dr. Freedman concludes that having the child wait and risking her permanent home based on mother's changes would not be CT Page 12347 recommended.
Since Shaitatiana has been in the same foster home for her entire life with adults she knows as her mom and dad, Dr. Freedman felt that this hopefully could become her adoptive home. This would mean that Shaitatiana would never again have to experience disruption or loss of a loved one despite the problems she experienced at the time of her birth.
Shaitatiana was born cocaine addicted due to mother's cocaine use during pregnancy. She was placed in her present foster home shortly after birth. She enjoys good health and has no known illnesses. Shaitatiana is developmentally on target and up to date with her immunizations. She is very attached to her foster parents and siblings and considers her foster parents her psychological parents since they have raised her from birth. She has had a very limited relationship with her biological mother. As Dr. Freedman concluded, to allow more time for Shaitatiana to develop a stronger relationship with her mother would not be consistent with her best interests. Mother had not been involved due to her drug involvement and incarceration. It is reported that Shaitatiana appears to be a happy and healthy toddler whose physical and emotional needs are met by this foster family.
ADJUDICATION[4]
The court finds by clear and convincing evidence that as of the date of the filing of the petition for termination of parental rights, June 29, 1998,[5] mother had failed to rehabilitate herself as required by Conn. Gen. Stat. § 17a-112(c)(3)(B).[6] The child had been committed as neglected to DCF on November 26, 1996, and at the time of the termination petition mother had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, she could assume a responsible position in her child's life. At the time of the filing of the termination petition, mother was incarcerated for a further violation of the criminal statutes and had not cooperated with substance abuse treatment. It was only after mother was incarcerated that she, by her own admission, commenced some programs and courses offered at the correctional institution. Clearly, mother cannot resume a constructive and useful role as a parent in any reasonable time. See In re Migdalia M.,6 Conn. App. 194, 203 (1986); In re Luis C.,210 Conn. 157, 166 (1989). Also, the failure to meet expectations is evidence of a failure to rehabilitate. In re Shavoughn K., CT Page 1234813 Conn. App. 91, 100 (1987). Mother has failed to fully comply with the court ordered expectations in that she continued to have encounters with the criminal justice system, refused to submit to drug testing to determine if she continued to abuse substances and admittedly never completed any significant substance abuse treatment program.
The court finds, therefore, adjudicatory grounds as regards to the mother. The court also finds by clear and convincing evidence that the facts warranting adjudication have existed for more than one year prior to the filing of the petition.
DISPOSITION
Having found that the grounds exist for termination of parental rights, the court now must consider the appropriate disposition. Here the focus is not on the parent but rather on the best interests of the child. The court may consider the evidentiary time frame up to the present. In re Tabitha P.,supra at 367. The following are the seven findings required by Conn. Gen. Stat. § 17a-112(e):
 1. Appropriate and timely services were provided to the mother by DCF, including transportation assistance, substance abuse counseling and visitation coordination. When the mother was incarcerated, DCF arranged to bring the child to the correctional institution. The specifics of the assistance are discussed above.
 2. The court finds that DCF made reasonable efforts to reunify the biological mother with her child given the situation and circumstances previously discussed. Mother never took full advantage of DCF's efforts. She did not complete her recommended substance abuse programs and fulfill all of her visitation with the child. Mother expressed an interest in reunification but did not follow through with DCF's reunification efforts. She gave up these efforts and eventually was incarcerated for further violations of the law where she remains today serving her sentence. She still has not completed an inpatient substance abuse program.
 3. DCF with the approval of the court set reasonable and realistic expectations in order to reunify the family. Mother initially complied with some of these expectations but then failed to comply with the expectations especially those involving CT Page 12349 substance abuse program participation and counseling.
 4. The child has strong emotional ties with her foster family. Even after visits with the biological mother she has only limited ties with her. The therapist reports that the child had a very limited relationship with her biological mother and was only comfortable with her while the foster parents were present.
 5. Shaitatiana is two years old with a date of birth of May 18, 1996.
 6. Mother was unable to conform her conduct to acceptable parental standards. Giving her additional time would not likely bring her performance as a parent within acceptable standards to make it in the best interest of the child to be reunited. The court relies upon the failure of the mother to have the sustained ability to parent and the nature of the foster parents' contacts where bonding has occurred.
 7. While parents means were limited, economic factors did not prevent regular continued contact with the child or the foster parents. DCF initially encouraged contact between mother and the child and provided transportation. No unreasonable conduct by DCF occurred.
The court notes that the child's attorney has recommended termination of parental rights. The court also notes that the biological mother is not capable of taking this child. The mother is incarcerated.
The court finds upon the evidence and testimony presented, that it is in Shaitatiana's best interest to terminate the parental rights of Ramona B. These findings are made after considering the child's needs, the length of time she has been separated from the family of origin, her need for a secure and permanent environment, the relationship that the child has with the foster parents and the totality of circumstances surrounding her life. The court is aware of "the well-known deleterious effects of prolonged temporary placement" of abused and neglected children. In re Juvenile Appeal (83-CD), 189 Conn. 276,292 (1983).
Based upon the foregoing findings, the court determines that it is in Shaitatiana's best interest for a termination of CT Page 12350 parental rights to enter with respect to the biological mother Ramona B. and it is hereby ordered that the parental rights of Ramona B. are terminated. Guardianship remains with the Commissioner of DCF. Michael S. remains the sole parent pending further proceedings. A permanency plan for the child shall be submitted within ninety days and a review of the plan shall be filed in accordance with state and federal law.
BRADFORD J. WARD JUDGE, SUPERIOR COURT