Memorandum of Decision
This is a petition for the termination of the parental rights of the mother and father of Joseph D. filed by the Commissioner of the Department of Children and Families (DCF).
The petition for termination of parental rights was filed on February 11, 1998. That, therefore, is the adjudication date. The disposition date is January 13, 1999.
The petition alleges as grounds for the termination of the parental rights of the father, Thomas W. that (1) he has abandoned the child, Joseph D. in that he has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child (General Statutes
section 17a-112(c)(3)(A)); and/or (2) there is no ongoing parent-child relationship between him and Joseph D. that ordinarily develops as a result of a parent having met on a continuing, day to day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interests of the child (General Statutes
section 17a-112(c)(3)(D)).
The petition alleges as grounds for termination of the parental rights of the mother, Kimberlee D. that (1) there is no ongoing parent-child relationship; and/or (2) Joseph D. has been denied by reason of an act or acts of commission or omission the care, guidance or control necessary for his physical, educational, moral or emotional well-being; and/or (3) the child has been found in a prior proceeding to have been neglected and the mother has failed to achieve such degree of personal CT Page 1097 rehabilitation as would encourage the belief within a reasonable period of time, considering the age and needs of the child, she could assume a responsible position in the life of the child (General Statutes section 17a-112(c)(3)(B)). At the commencement of the trial, DCF withdrew the second ground (act of commission) for termination. At the conclusion of the evidence, DCF withdrew the first ground (no ongoing parent/child relationship) for termination. Therefore, as to the mother, DCF relies solely on the failure to rehabilitate allegation.
As to the petition directed to each parent, DCF must prove by clear and convincing evidence the facts to support the ground(s) alleged, and, that termination of the parental rights of that parent is in the best interest of Joseph D.
The court finds the following facts have been proven by clear and convincing evidence. Joseph D. was born on March 2, 1991. He resided with his mother from birth, except when he has been in the custody of DCF. He has not ever resided with his father. On December 11, 1992, DCF (then DCYS) invoked a 96 hour hold and took Joseph into their custody. Joseph's mother, at the time lived with an unrelated male. She had left Joseph with this male who was too intoxicated to care for the child. He had called the police for help and DCF was called in. Thereafter an Order of Temporary Custody was granted on December 14, 1992. At that time a neglect petition was initiated by the Department regarding Joseph. The child was returned to his mother on January 19, 1993. On January 21, 1993, after the entry of a nolo contendere plea by the mother, Joseph was adjudicated neglected. An agreed disposition of protective supervision for a period of 18 months was proposed with a disposition date set for after the receipt of the mandated social study. However, on January 25, 1993, just four days later, the mother requested DCF take Joseph and place him in a foster home. Thereafter, Joseph stayed in foster care until late April, 1993 when family preservation services were utilized. On May 6, 1993, the disposition of protective supervision was ordered by the court for 18 months. A social study by the DCF worker and two psychological evaluations by Dr. David M. Mantell dated February 8, 1993 (Exhibit 11) and March 14, 1993 (Exhibit 12) and a psychiatric evaluation by Dr. Richard B. Sadler (Exhibit 14) were prepared for the disposition phase of that proceeding. All of these reports are in evidence before this court. Joseph remained living with his mother during this period of protective supervision. On April 8, 1994, the protective supervision was CT Page 1098 ended by court order.
On January 26, 1996, another order of temporary custody was issued by the court. Circumstances surrounding the issuance of the order were that the mother called DCF indicating that Joseph was at day care and should be picked up by the department and placed in foster care. She stated that she wanted him put up for adoption. When the mother did not come to pick Joseph up from the day care, DCF invoked a 96 hour hold and then sought the order of temporary custody. Contemporaneously with the filing of the application for order of temporary custody, DCF filed a neglect petition regarding Joseph.
In preparation for the adjudication and disposition hearing on the neglect petition, an updated psychological evaluation was performed by Dr. Mantell and a report submitted dated May 8, 1996 (Exhibit 13), an updated psychiatric evaluation was performed by Dr. Sadler and a report submitted dated August 11, 1996 (Exhibit 15) and a social study was submitted to the court by the DCF social worker, dated March 5, 1996. All three of these documents are in evidence in the present proceedings. Dr. Mantell found Joseph to be very aggressive, easily frustrated and with a low tolerance level.
At that time, there was poor psychological boundaries between the mother and Joseph. If not allowed to express himself, Dr. Mantell feared Joseph would not have normal ego development. While anticipating an institutional goal of reunification, it was Dr. Mantell's opinion that Joseph should not live with his mother and visitation should only be in a therapeutic setting. On November 16, 1996, Joseph D. was adjudicated neglected and uncared for.
At that time expectations were issued to the mother by the court. They were: keep your whereabouts known to DCF and your attorney, visit Joseph as often as DCF permits, participate in parenting counseling and individual counseling and follow the counseling recommendations, sign releases as requested, and secure and maintain adequate housing and income. (Exhibit 3). On that same date, by way of disposition, Joseph was committed to the custody of the Commissioner of DCF for a period not to exceed one year.
The mother's expectation to visit Joseph as often as DCF permits was not kept by her. After missing many scheduled CT Page 1099 visitation sessions (which was disruptive and very distressing for Joseph) the visitation was modified to have the mother contact DCF whenever she wanted visitation. Her contact was sporadic. After Joseph stated that his mother had sexually abused him in some way, DCF terminated the mother's visits because she had tried to influence Joseph in a visit to recant his statements (and become behaviorally erratic on the drive home). She was told by DCF that there would be no further visits until she had a sex offender assessment. The mother steadfastly denied Joseph's allegations. However, she neither pursued the evaluation nor pursued visitation through court.
On August 15, 1997, DCF sought to extend the period of commitment by petition to the court. A social study was submitted to the court which is in evidence before this court. The court, on October 9, 1997, ordered an extension of the commitment of Joseph for a period not to exceed one year. Thereafter, the present petition was filed.
In court proceedings dated, January 14, 1993 and February 4, 1993 (after the issuance of the first order of temporary custody), the father Thomas W. expressed an interest in establishing a relationship with Joseph. To that date he had had virtually no contact, having visited him only three or four times since his birth two years earlier. However, thereafter, he failed to contact DCF to arrange any visitation and he failed to appear for or cooperate in court ordered psychological evaluations. Mr. W. was last known to reside in the Manchester area. A search of correction records by DCF found his last known address to be Hartford Correctional Institute, but he was no longer an inmate. He was served with notice of the termination of parental rights petition by publication in the Hartford Courant as confirmed by the local juvenile court on March 9, 1998. The father has failed to appear. He was properly served by publication. Reasonable efforts were made by DCF to notify him of these proceedings. The trial proceeded against the father on a default basis.
Another psychological evaluation was done of Kymberlee and Joseph by Dr. Anderson, addressing issues surrounding the termination of parental rights petition. As with Dr. Mantell and Dr. Sadler, Dr. Anderson's report is in evidence before the court; all three doctors testified in this proceeding. While Dr. Mantell testified, the mother had a brief outburst in the courtroom. He went on to testify that the outburst was consistent with how the mother presented herself to him both in 1993 and CT Page 1100 1996 in both its nature and content. He noted that also there was a lack of growth in the parent-child relationship from 1993 to 1996 and cautioned that it would be a very long process toward its improvement.
Kymberlee, the mother, appeared and was represented by counsel throughout these proceedings. She vigorously opposed the termination proceeding, through her counsel's cross-examination of the department's witnesses. Prior to the trial on the merits of this matter, a competency hearing was held regarding Kymberlee. Dr. Kenneth Blatt, a psychiatrist testified. The court (Quinn, J.) found the mother competent. Exercising its discretion, the court ordered the guardian ad litem who had been appointed for Kymberlee in 1993 court proceedings[2] to remain in the case. The guardian ad litem was present throughout the trial of this matter.
At the time of the neglect adjudication in November, 1996. the court had before it the update report from Dr. Mantell. His previous evaluations of her in 1993 described her as having intellectual limitations. This remained unchanged in his 1996 evaluation. His findings were confirmed in Dr. Sadler's report as well. She has borderline intellectual capacity but denies it. This denial is consistent with her way of dealing with challenges. She denies that she is anything but an excellent mother. Three times prior to the neglect adjudication, Kimberlee had asked DCF to take Joseph because she could not care for him. In each incident that this occurred, Kimberlee later denied the circumstances that occurred around each of the times that she called DCF to take Joseph. The most recent occasion (resulting in the order of temporary custody) on January 24, 1996, occurred when she called the DCF Careline to pick Joseph up from daycare because she could no longer care for him. On that same day, she was hospitalized for an evaluation after suicide ideation. She was released from the hospital. Subsequently, she denied suicide thoughts. She states she was simply looking for an avenue to put Joseph in foster care. Joseph has been in foster care since that date. With these events and her explanations, Kimberlee still denied a need for parenting classes when Dr. Mantell evaluated her in June, 1996.
At that time, Dr. Mantell found that while Kimberlee was willing to attend counselling, she did not recognize any of Joseph's specialized needs. In observation of Joseph with his mother, Dr. Mantell found that she did not see Joseph as a CT Page 1101 separate person but merely as an extension of herself. As a result, Joseph presented as a child who was very demanding and dependent. This behavior was confirmed by the foster mother. Joseph and his mother were very affectionate in the interview. She did not observe his boundaries, instead performing tasks for him, answering questions for him and suggesting emotions to him. This interference with his emotional development was of great concern to Dr. Mantell in 1996.
Dr. Sadler, a psychiatrist, reported as well to the court for the neglect disposition. The mother failed to attend the parent-child interaction with him. He noted at that time that although she had attended parenting classes she could not offer any new skills she had gained.
In June, 1998, Dr. Anderson wrote, "The present evaluation finds little to suggest improvement in Kim's stability or parenting skills. She may have become more involved in counselling services, starting four months before her interview, but her clinical presentation matched that which was described by the previous evaluators. She lacked insight into her past and present situation, and did not accept any appreciable degree of personal responsibility for her problems, which she entirely blamed on interference by DCF. She did not acknowledge any instances of past poor judgment or neglect of her son, and asserted that she was more emotionally stable than before, but did not have any accomplishments to cite in support of her increased stability. . . . Based on the available information and evaluation results, there is no reason to believe that Kim will become fundamentally more stable or better able to provide an adequate home for her son in the next five to ten years." This court received absolutely no evidence to challenge this conclusion of Dr. Anderson, whether through his cross-examination or other evidence. This conclusion is soundly based in the evidence and the court accepts and makes it a factual finding.
Joseph has been in and out of foster care since he was one year old. Presently Joseph has been in foster care since January, 26, 1996, just short of three years. He is doing well in foster care. This is his second placement after an initial short period in another foster home. Joseph is happy in his foster placement. He does not want to see his mother. His foster parents have expressed a desire to adopt Joseph. They are concerned about keeping Joseph if visitation is reinstated with his mother. This concern is based upon their experience of his acting out, CT Page 1102 aggression towards people and objects, and throwing tantrums, all of which have historically occurred immediately prior to and after his visits with his mother. They are concerned that they could not, as a family, handle the re-emergence of that behavior if Joseph were to once again start seeing his mother. His continued residence in his foster family would be jeopardized by a renewal of contact with his mother. A hint of these problems resurfaced when Joseph was told that he would be seeing his mother for the psychological evaluation with Dr. Anderson in June, 1998. He immediately recommenced individual therapy to address his anxieties. Joseph's sense of security is threatened by contact with his mother. As best stated by Dr. Anderson, "Joseph's stability would also be disrupted by renewed attempts at reunification with his mother. She has not provided him with consistent care in the past, and is now a threatening figure. Also, any efforts to return him to her custody would threaten the existing security of his foster home, and would be likely to have a very unsettling effect."
 Adjudication
The court finds, by clear and convincing evidence, that as of February 11, 1998, Joseph D. had been abandoned by the father Thomas W. He had failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of Joseph D. (Connecticut General Statutes section 17a-112(c)(3)(A)). Indeed, by clear and convincing evidence it has also been proven that he has shown no interest in Joseph D. or maintained any communication with Joseph D. Therefore, it is found by clear and convincing evidence that there is no on-going parent-child relationship between Thomas W. and Joseph D. that ordinarily develops as a result of a parent having met on a continuing day-to-day basis the physical, emotional, moral, and educational needs of the child General Statutes section 17a-112(c)(3)(D). The court finds that it would be detrimental to Joseph's best interests to allow further time to see if Thomas W. would come forward to establish such a relationship.
Kimberlee has failed to take the necessary steps to deal with her parenting inadequacies. While her borderline intellectual capacity is a hindrance, she refuses to engage in the sustained continuous therapy necessary to have insight into the mistakes she has made as a parent and the significant shortcomings she suffers. Joseph D. has been in foster care for almost three years. He cannot wait for his mother to undertake these CT Page 1103 responsibilities in a sustained, continuous way. These past years have been a road paved by her fitful attempts at compliance, all the while denying her need for the services being provided to her. Her rehabilitation within a forseeable period of time is not likely. In re Migdalia M., 6 Conn. App. 194, 203 (1986). With respect to the statutory grounds for the termination of the parental rights of the mother, Kimberlee D., the court finds by clear and convincing evidence that Joseph D. has previously been adjudicated neglected on November 16, 1997, and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Joseph D., the mother could assume a responsible position in the life of Joseph D. General Statutes section 17a-112(c)(3)(B).
The court finds that all of these grounds have existed for more than one year.
The court makes the following mandatory factual findings as are required by General Statutes section 17a-112(e) in addition to the findings already stated herein as they relate to these statutory requirements:
1. Timeliness, nature and extent of services offered or provided to facilitate the reunion of child with parent. Appropriate and timely services were offered to mother by DCF, including casework services, psychological counselling, transportation assistance, psychological and psychiatric evaluation, parenting education services, visitation coordination, and sex offender assessment. No services could be offered to the non-appearing father because his whereabouts are unknown.
2. Terms of any applicable court order, and the extent to which the parties have fulfilled their obligation under the order. Expectations were set for the mother at the time of the neglect adjudication. She was ordered to visit Joseph as often as DCF permits. She did not do so.
The mother was required to participate in individual counselling. While it appears that she has gone to counsellors her `swapping' of therapists has had an adverse impact. She started with Dr. Schroeder. Then claiming he was inappropriate with her she switched to Dr. Cavino. She was inconsistent in her attendance to therapy with Dr. Cavino. Her compliance was so CT Page 1104 sporadic that he could not promulgate a diagnosis. The mother switched therapists again to Intercommunity Mental Health and Dr. Larry Bilker.
The mother did complete parenting classes as ordered in August, 1997.
The mother was ordered to maintain adequate housing. She moved in the year following the neglect adjudication, however there is nothing to suggest that she did not maintain adequate housing.
The father never appeared in these proceedings; therefore, no court order was addressed to him.
3. Feelings and emotional ties of the child with respect to parent, and, any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed sufficient emotional tie. Joseph has strong emotional ties to his foster family. They have provided for his physical care, custody and control since 1996. Joseph has no emotional ties to his father. Joseph has some positive feelings toward his mother but has no desire to see her. He sees her as a threat to his stability in his foster home.
4. Age of the child. Joseph D. was born on March 2, 1991 and is presently seven years old. On the adjudication date he was approximately three weeks short of that milestone. He has been in foster homes for much of his childhood. He deserves stability in a nurturing, secure home. The father is gone. The mother cannot offer Joseph D. a secure home at any time in the forseeable future.
5. Parent's efforts to adjust to her circumstances to make it in the best interest of the child to return child to parent's home in the forseeable future. The father, Timothy W. has made no effort in these regards at all. The mother has not made realistic and sustained efforts to conform her conduct to acceptable parental standards. She does not have a commitment to recognizing her shortcomings and failings as a parent and therefore cannot improve upon them. She continues to maintain that she is an excellent parent and to deny the circumstances that led to the past neglect adjudications. Mother needs extended and intensive therapy for five to ten years to address these issues. She has no plan for the return of Joseph to her care. To give her additional CT Page 1105 time is not likely to bring her performance as a parent within acceptable standards sufficient to make it in the best interests of Joseph D. that they be reunited. In re Luis C.,210 Conn. 157, 168 (1989).
6. Extent to which the parent has been prevented from maintaining a meaningful relationship with the child by unreasonable acts of child, other parent, or other person or by economic circumstances. Father has had no contact nor sought any contact with Joseph. DCF initially created a schedule of visitation and the mother missed many of them. This created great emotional upheaval for Joseph. Mother was uneven in seeking visitation when it was to be initiated by her. Such visitation was never withheld. The mother had been cautioned not to speak to Joseph about his sex abuse allegations or create pressure for him around them. In March, 1997 notwithstanding these cautions she did so anyway. After the visit was cut short by DCF she acted irrationally, telling the worker driving her home she would jump out of the motor vehicle. After that her visits were suspended by DCF because of this behavior of mother.
7. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Child Welfare Act of 1980 (and as supplanted by the Adoption and Safe Families Act of 1997). The court finds that DCF made reasonable efforts (the services provided have been recited earlier) to reunify the mother with Joseph D. DCF periodically offered updated individual treatment plans and pursed it with the mother. Mother's own erratic behavior and lack of follow through on therapy and visitation were acts of the mother; the Department's efforts were reasonable. In re Tabitha T., 51 Conn. App. 595, 600 (1999). No efforts could be made regarding the father because of his own action of abandonment of Joseph D. and failure to remain in contact with DCF so that reasonable efforts could be made.
 Disposition
Joseph is 7 years old. He has been in foster care continuously for three years, with prior stays in foster care as well. When first placed in foster care, in the spring of 1996, Joseph regularly had tantrums, nightmares, negative behavior and impulsive outbursts, including kicking people and objects. As a result, Joseph was evaluated psychiatrically at Mt. Sinai Hospital because of his aggressive behavior, tantrums, and threats to hurt himself. He was diagnosed with an anxiety CT Page 1106 disorder. His tantrums and nightmares would increase in frequency around scheduled times for visits with his mother. A very structured environment was recommended. He was moved to his present home, a specialized foster care home.
Joseph has been in therapy for 2 1/2 years. His progress has been excellent. He is now very happy in his foster home and has stated he wants to stay there. While he states that he cares about his mother he emphatically does not want to see her anymore. Joseph has seen his mother only once since March, 1997. His negative behavior had recurred in anticipation of that visit.
Well near half of Joseph's life has been spent in foster care. He needs and deserves stability and security. He is anxious that he will lose the home of his foster family that he has grown so close to emotionally. He needs the consistency of care, love, nurturance and stability that is provided by his foster family. The court finds, based upon all of the evidence presented, that DCF has proven by clear and convincing evidence that it is in the best interests of Joseph D. to terminate the parental rights of Kimberlee D. and Timothy W. to this child. The court makes this finding after considering Joseph's sense of time as a child, his need for a secure and permanent home environment, his positive relationship with his foster parents, and the totality of the circumstances. In re Alexander V., 25 Conn. App. 741, 748
(1992); cf. J. Goldstein, A. Freud A. Solnit, Beyond the BestInterests of the Child 99 (1979).
Based on the foregoing findings, the court orders that a termination of parental rights enter, with respect to Joseph D's father. Timothy W. and mother, Kimberlee D. It is further ordered that the Commissioner of the Department of Children of Families is appointed the statutory parent for the purpose of securing an adoptive family. The Commissioner shall give Joseph's present foster parents first preference for adoption. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
BY THE COURT
MUNRO, J.
[2] The attorney presently serving as guardian ad litem is CT Page 1107 successor to a prior appointee who was subsequently replaced by the court. General Statutes 45a-708(a) provides: "When, with respect to any petition filed under section 17a-112, section 45a-715 or section 45a-716, it appears that either parent of the child is a minor or incompetent, the court shall appoint a guardian ad litem for such parent. The guardian ad litem shall be an attorney-at-law authorized to practice law in Connecticut or any duly authorized officer of a child-placing agency if the agency is not the petitioner."