IN RE MIGDALIA M.*
(2826)
(2827)

DUPONT, C. J., HULL and BORDEN, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued October 2, 1985—decision released February 11, 1986

*John D. Thomas,* for the appellant (father of the minor child).

*Cornelius J. Ivers,* with whom, on the brief, was *Patrice Noah,* for the appellant (mother of the minor child).

*John H. Doermann,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Robert W. Garvey,* assistant attorney general, for the appellee (department of children and youth services).

*Laurie Balmuth,* with whom, on the brief, was *Richard Gee,* for the minor child.

DUPONT, C. J. This case involves a petition to terminate the parental rights of parents of a child with severe medical problems, brought by the commissioner of the department of children and youth services (hereinafter DCYS). The trial court granted the petition and the parents have separately appealed.[1]

The issue on appeal is whether DCYS proved by clear and convincing evidence that one or more of the statutory grounds for the termination of parental rights, as

---

[1] The appeals were combined upon motion of the appellants.

provided in General Statutes (Rev. to 1981) § 17-43a (a), as amended by Public Acts 1982, No. 82-202, existed.[2] The grounds for the petition were the same as to each parent. DCYS alleged that the parents (1) abandoned the child in the sense that they have failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare, or (2) failed to achieve such degree of personal rehabilitation as would reasonably encourage the belief that at some future date they could assume a responsible position in their child's life, or (3) have no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral, and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.

The trial court found that all three grounds for termination had been proven as to the mother, and that two of the grounds had been proven as to the father. The father's appeal only concerns the ground that he failed to achieve personal rehabilitation within the terms of the statute.[3] The mother's appeal concerns all three grounds alleged by DCYS and found by the court.

The claims of error of the parents are basically the same, although the facts as to each differ. Both parents claim that the trial court erred in failing to make

---

[2] The grounds alleged in the petition for termination of parental rights are now embodied in General Statutes § 17-43a (b). All statutory references in this opinion, unless otherwise noted, are to General Statutes (Rev. to 1981) § 17-43a (a), as amended by Public Acts 1982, No. 82-202, as it existed on December 22, 1982, the date of the petition.

[3] DCYS withdrew its allegation of statutory abandonment by the father just prior to trial. During oral argument, counsel for DCYS conceded that the trial court erred in finding by clear and convincing evidence that there was no ongoing parent-child relationship between the father and the child.

written findings as required by General Statutes (Rev. to 1983) § 17-43a (b), as amended by Public Acts 1983, No. 83-387,[4] and in considering the suitability and circumstances of prospective adoptive parents. Other issues raised by the parents merge into the main issue of whether any one of the statutory grounds of General Statutes (Rev. to 1981) § 17-43a (a), as amended by Public Acts 1982, No. 82-202, were proven by clear and convincing evidence.

The minor child, through her counsel, claims that the concept of rehabilitation as delineated in General Statutes (Rev. to 1981) § 17-43a (a) (2), as amended by Public Acts 1982, No. 82-202, is an inappropriate consideration in this case, and that it was error to terminate parental rights on the basis of that concept.[5] Her other claims of error are similar to those made by one or both of the parents.

The child of the parties was placed in foster care in July of 1981, when her parents agreed to a ninety day voluntary placement with DCYS. In March of 1982, the parents agreed to a finding that she was neglected and she was committed to the custody of DCYS. In June, 1982, the parents were instructed as to the expectations of the court. The petition to terminate parental

---

[4] The trial court's memorandum of decision does not make specific findings of fact for each parent as to each ground for termination of parental rights but lumps all the facts found together, and then states conclusions as to the grounds for termination. As of December 22, 1982, the date of the petition, there was no statutory requirement for written findings. Public Acts 1983, No. 83-387, effective October 1, 1983, amended General Statutes (Rev. to 1983) § 17-43a (b) to require written findings. The requirement of written findings is now embodied in General Statutes § 17-43a (d). A requirement of written findings does not affect the substantive rights of the parties. The memorandum of decision, coupled with the court's further articulation, was a sufficient compliance with the requirement of written findings.

[5] Although this claim is made in the brief of the child's counsel, during summation in the trial court, counsel stated that the natural parents of the child, by clear and convincing evidence, "are not able to be rehabilitated."

rights was filed on December 22, 1982, and the hearing on that petition was held on October 17, 1983.

The dates are relevant because of the differing views of the parties as to the applicable statutory standards which governed the trial of this case. The father and counsel for the child contend that the criterion of the best interest of the child is not involved in the termination of the parents' rights, whereas DCYS and the mother contend and admit, respectively, that the best interest of the child is involved.

The grounds for termination of parental rights, as enumerated in General Statutes (Rev. to 1981) § 17-43a (a), as amended by Public Acts 1982, No. 82-202, and as alleged in the petition, were amended between the date of the petition and the date of the trial. See Public Acts 1983, No. 83-478. The amendment was effective October 1, 1983. If the amendment were to be the statutory test for the termination of parental rights, the best interest of the child would be a significant factor in a termination of parental rights case. See 26 H. R. Proc., Pt. 17, 1983 Sess., pp. 6111, 6114, remarks of Representative Alfred J. Onorato. The amendment added another statutory ingredient by providing that the Superior Court, after hearing and notice, may grant a petition if it finds that termination is in the best interest of the child. If the best interest of the child is a factor to be proven by clear and convincing evidence, in addition to the statutory grounds listed, then evidence as to the suitability and availability of adoptive parents would be relevant in a termination proceeding, and also relevant to a determination of whether there is a statutory ongoing parent-child relationship, as interpreted by Connecticut Supreme Court cases.[6] See 26 H. R. Proc., Pt. 24,

---

[6] The judicial severance of the issues of whether a termination of parental rights is statutorily warranted and whether a proposed adoption is desirable, as required in cases such as *In re Juvenile Appeal (Anonymous),* 181

1983 Sess., pp. 8673–74, remarks of Representative Antonina B. Parker.

Another substantive change made by the amendment involves the statutory standard for the failure to achieve personal rehabilitation. Prior to the amendment, DCYS had to prove that a parent failed to achieve "any such degree of personal rehabilitation as would reasonably encourage the belief that *at some future date* they could assume a responsible position in their child's life." (Emphasis added.) General Statutes (Rev. to 1981) § 17-43a (a) (2). After the amendment, DCYS had to prove that a parent "failed to achieve such degree of personal rehabilitation as would encourage the belief that *within a reasonable time, considering the age and needs of the child,* they could assume a responsible position in the life of the child." (Emphasis added.) Public Acts 1983, No. 83-478. Putting aside the statutory differences between "any such" and "such" or "reasonably encourage" as opposed to "encourage," the amendment makes two major changes. "At some future date" is quite another test than "within a reasonable time." See *In re Juvenile Appeal (84-3),* 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). The amendment also adds that the age and needs of the child must be considered, factors not previously listed in the statute.

The initial question to be determined on appeal, before the trial court's conclusions may be tested by examining the reliable evidence to support those conclusions, is whether the hearing should have been governed by the law existing as of the date of the petition, or by the law as it existed as of the date of the trial.

Conn. 638, 645, 436 A.2d 290 (1980), has been weakened by the amendment, as have cases such as *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 420 A.2d 875 (1979), which eschew the test of the best interest of the child in parental rights termination cases.

General Statutes § 1-1 (u) provides the general rule as to the applicability of amended or repealed statutes. "The passage or repeal of an act shall not affect any action then pending." Id. Case law follows the words of the statute and makes it clear that statutes affecting the substantive rights of parties do not affect pending actions unless a contrary legislative intent is expressed. *Hunter* v. *Hunter,* 177 Conn. 327, 332, 416 A.2d 1201 (1979); *New Haven* v. *Public Utilities Commission,* 165 Conn. 687, 726, 345 A.2d 563 (1974); *Little* v. *Ives,* 158 Conn. 452, 455, 262 A.2d 174 (1969).

Although the issue of whether parental rights should have been terminated is to be decided by a trial court on the basis of *conditions* existing at the time of trial; *In re Juvenile Appeal (83–DE),* 190 Conn. 310, 318, 460 A.2d 1277 (1983); there is no legislative or decisional mandate allowing a trial court to decide that issue on the basis of *statutes* existing at the time of trial, but not in effect when the termination petition was filed. The mandates are to the contrary. Parents have a constitutionally protected right to raise and care for their children and that protection cannot be diluted by the use of statutory standards enacted subsequent to a petition to terminate that right, absent a counter legislative directive. See *In re Laura F.,* 33 Cal. 3d 826, 662 P.2d 922, 191 Cal. Rptr. 464 (1983); *Matter of Myers,* 417 N.E.2d 926 (Ind. App. 1981). The trial court in this case, in its memorandum of decision, reiterated the grounds for termination as they existed as of the date of the petition, concluded that the termination of parental rights was in the best interest of the child, and ordered DCYS to implement the planned adoption of the child by her foster parents, "if and whenever said step is practicable."

Since the legislature did not except pending actions when it amended the statute, the appellate review of this case is limited to a review of whether the trial

court's conclusion to terminate parental rights of both parents can stand based on General Statutes (Rev. to 1981) § 17-43a (a), as amended by Public Acts 1982, No. 82-202, and as it existed as of the date of the petition.

Many of the relevant facts involved in this case are not in dispute. The minor child has serious medical problems, consisting of renal failure, seizure disorder, left ventricular disorder and hypertension. She was born in 1975 and resided with her parents until she was approximately four years old when it was learned that she suffers from a chronic kidney disease requiring a lifelong vigorous regimen of medication, diet control and physical care.[7] After a hospitalization in 1979, her parents separated and she was cared for by an uncle for about seven months, and then by her mother and father who had reunited. She was hospitalized five times between May of 1979 and July of 1981 while in the care of her mother, father, or uncle, due to improper diet or inappropriate administration of medication. Her parents had minimal educations in Puerto Rico, and have marginal or nonexistent skills in reading, writing or speaking English. The parents are now divorced. The mother has custody of another child of the marriage, and the father has custody of three children, including the child involved in this appeal.

Two years after the diagnosis of her medical problems, the minor child was voluntarily placed in foster care by her father. Subsequently, pursuant to a petition and hearing thereon, but with the acquiescence of both parents, she was committed to DCYS as a neglected and uncared for child. That commitment contained the seeds for the present claim of DCYS that the parents have failed to become personally rehabili-

[7] During the pendency of this appeal, the child received a kidney transplant. The medical testimony at the trial was that, even with a transplant, she will need medication and a special diet for the rest of her life.

tated within the terms of General Statutes (Rev. to 1981) § 17-43a (a) (2), as amended by Public Acts 1982, No. 82-202. A subsequent judicial review of the commitment order instructed the parents as to the court's expectations which would need fulfillment before the commitment would be revoked. These were that they would keep appointments with DCYS, would visit the child as often as possible, would participate in counselling at Yale Renal Clinic and would procure adequate housing.

It is apparent from a reading of the transcript, and admitted by all parties, that the care of the child is tantamount to paramedical care, and requires several hours of time each day. At the time of the hearing on the petition to terminate parental rights, she needed six types of medication, administered at various times during the day, was receiving a weekly blood transfusion, required three medical appointments per week, and was severely restricted in her diet. During the time of foster placement, the father drove, on a consistent biweekly basis to her foster home, taking her some thirty miles distant to his home, and then returning her six to seven hours later. The mother cannot drive, and the father brings the child to visit with her mother on almost every occasion of his visits with the child. The parents live in Meriden, the foster parents in Woodmont and the Yale Renal Clinic is located in New Haven. Bilingual instruction is not always available at the Yale Clinic. The father had held the same factory job for seven years at the time of the hearing, works a shift until midnight, works every other weekend and earns $200 per week. The mother does not work and receives state aid.

I

The only ground for termination of the parental rights of the father which needs to be considered on

appeal is whether the trial court erred in finding by clear and convincing evidence that under the provisions of General Statutes (Rev. to 1981) § 17-43a (a) (2), as amended by Public Acts 1982, No. 82-202, he failed to achieve personal rehabilitation. The statute as it read as of the time of the filing of the petition by DCYS required proof of a failure "to achieve any such degree of personal rehabilitation as would reasonably encourage the belief that *at some future date* [the parent] could assume a responsible position in [the] child's life." (Emphasis added.) This section is but one of three grounds upon which the mother's parental rights could be terminated. The discussion of this section of the statute applies to both parents.

Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to the statutory standards. See *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 640, 436 A.2d 290 (1980); *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 671, 420 A.2d 875 (1979).

"Personal rehabilitation" as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. The unamended statute sets no particular time limit as to when a parent must be able to assume again a responsible position in the life of his or her child. *In re Juvenile Appeal (84-3)*, supra. Nor does it require the parent to be able to assume full responsibility for a child, without the use of available support programs. Id. In this case, the behavior modification sought by the state was that the parents keep appointments with DCYS, visit the child as often as possible, participate in counselling at a renal clinic and procure adequate housing.

The trial court found that in 1981, prior to the child's commitment to DCYS, the mother did not attend bilingual clinical instruction sessions arranged for her at Yale New Haven Hospital and did not keep appointments for tissue typing to evaluate the possibility of a kidney donor. These delicts, however, occurred before the child was committed to DCYS as uncared for, and before the committing court stated its expectations of the parents' role in the care of the child. A review of the transcript reveals that there was no evidence as to whether or not the mother kept appointments for tissue typing, and no evidence that any appointments were made for her to attend bilingual clinical instructions. There was evidence, however, that she attended such instructional sessions only once or twice. There was no evidence as to whether the mother had kept appointments with DCYS, although there was evidence that an employee of DCYS had visited her home. That same employee testified that the mother's two bedroom apartment was inadequate to house the child, another child, the mother and her boyfriend. Additional testimony was that the apartment was clean and well-furnished.

The trial court found that as of the date of the termination hearing the father had not engaged in the requisite counselling and did not have adequate housing, and further found that the mother had not complied with any of the instructions contained in the commitment order of 1982. The evidence was, however, that the father had engaged in counselling. A social worker for DCYS testified that his housing was inadequate because his apartment contained only one bedroom, and another daughter was living with him, in addition to a female friend. "Adequate housing" was never defined for the parties by DCYS or by the committing court in its statement of expectations regarding parental rehabilitation.

The father's testimony indicated that as of the date of the hearing, although not at the time of her commitment, he generally knew what medication his daughter should take and what food she should not eat. His testimony on that point may be summarized by his statement that "[n]ow that I know how to give her the medication I don't have the girl."

At the termination hearing, a pediatric nephrologist testified that neither parent has an understanding of their daughter's medical problems or how to care for her, although he also testified that he had no contact with the mother after July, 1981, and sporadic contact after that with the father. A psychiatrist testified that the child had a good relationship with both her natural and foster parents but that her "best interest" was with the foster parents.

A thorough review of the transcript indicates that both parents love their child, have never been physically abusive to the child, and have never engaged in any deliberate act to harm the child. Their parental limitations lie in their inability to care for a seriously ill child. It is possible that during the minority of their child they may never be able to "rehabilitate" themselves in the sense that they will be able to care for the child all by themselves. They can never be restored to the parents they were before the child became so seriously ill. It is the child's health problems, not some personal deficiency of theirs, which caused the original commitment. The wealthy parent who cannot give daily arduous care to a severely physically handicapped child obtains the care necessary by paying for it. The affluent parent does not have his parental rights terminated because of an inability to learn how to care full time for a physically dependent child. The low income parent who cannot cope with the daily care of

such a child should be put in no different position as far as concerns the termination of his or her parental rights.

Neither parent seeks to revoke the child's commitment to DCYS and neither seeks to remove their daughter from the home of the foster parents, both recognizing the outstanding ability of the foster parents to provide their daughter with proper medical supervision.

General Statutes (Rev. to 1981) § 17-43a (a) (2), as amended by Public Acts 1982, No. 82-202, does not provide that in order to achieve personal rehabilitation a parent must meet the expectations of a court as ordered pursuant to a commitment hearing. See *In re Juvenile Appeal (Docket No. 10718)*, 188 Conn. 259, 263 n.4, 449 A.2d 165 (1982). The underlying cause for commitment was the inability of the parents to provide physical care on a daily basis for a child with a life-threatening disease. The expectations of the court as to the rehabilitation required of them related to this inability. Even if there were a failure of rehabilitation because they did not comply with all of the expectations, that failure could not be converted into a belief that neither could, at some future date, assume a responsible position in the child's life. Nor does the statute define the degree of personal rehabilitation required or the meaning of a "responsible position in the life of the child." "A responsible position" is not necessarily the same thing as a full time caretaker. The mother was not a full time caretaker even prior to the termination of her parental rights since the legal custody of the child had been awarded to the father, incident to a judgment of dissolution of their marriage. The statute does not require that a parent must either assume a full time responsibility for a child's care, or suffer a termination of parental rights. The sole reason for the trial court's conclusion that parental rights should be terminated

for a failure to achieve personal rehabilitation was the failure of the parents to comply with the expectations of the court which committed the child to DCYS. The trial court was presented with an extraordinary factual dilemma due to the severity of the child's physical condition.

DCYS, however, did not prove by clear and convincing evidence that all of the expectations of the committing court were unfulfilled as to either parent. This, coupled with the lack of clarity as to some of those expectations, and the use of the expectations as the sole standard for the trial court's conclusion that parental rights should be terminated pursuant to General Statutes (Rev. to 1981) § 17-43a (a) (2), as amended by Public Acts 1982, No. 82-202, leads us to a determination that the trial court was clearly erroneous in its conclusion.

If the statutory standard for termination of parental rights included the best interest of the child and required personal rehabilitation to occur within a reasonable time, considering the age and needs of the child, as it now does, a different result might be warranted in this case. Jurisdictions with statutes requiring proof that a termination of parental rights is in the best interest of the child have usually found termination to be appropriate if a parent has failed over an extended period of time to adjust his or her behavior to provide for the physical needs of a seriously ill or handicapped child. See *Thompson* v. *Arkansas Social Services,* 669 S.W.2d 878 (Ark. 1984), appeal dismissed, 469 U.S. 926, 105 S. Ct. 316, 83 L. Ed. 2d 254 (1984); *In re Laura F.,* supra; *People in the Interest of V.A.E.Y.H.D.,* 199 Colo. 148, 605 P.2d 916 (1980); *Matter of Welfare of P.J.K.,* 369 N.W.2d 286 (Minn. 1985). If, however, the parents of a child with developmental disabilities have parenting limitations but love their child, consistently express an interest in the child's welfare, and

periodically visit with the child committed to foster care, parental rights should not be terminated unless the effect on the child is detrimental, since the situation affords the child both the consistency of foster parenting and the relationship with natural parents. See *In re R.S.*, 167 Cal. App. 3d 946, 213 Cal. Rptr. 690 (1985); *In re Michael G.*, 147 Cal. App. 3d 56, 194 Cal. Rptr. 745 (1983). Since no other grounds of General Statutes (Rev. to 1981) § 17-43a (a), as amended by Public Acts 1982, No. 82-202, form the basis for a termination of the father's parental rights, the petition to terminate the father's parental rights should have been denied.[8] Nor can the termination of the mother's parental rights be sustained on this ground.

## II

Since DCYS need only prove one of the grounds of General Statutes (Rev. to 1981) § 17-43a (a), as amended by Public Acts 1982, No. 82-202, in order to terminate parental rights, it is necessary to examine the trial court's findings as to the other grounds upon which it terminated the mother's rights.

General Statutes (Rev. to 1981) § 17-43a (a) (1), as amended by Public Acts 1982, No. 82-202, provides that a petition for termination of parental rights may be granted if the court finds "upon clear and convincing evidence," that a parent has "abandoned the child in the sense that [the parent has] failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare."

Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial sup-

---

[8] The decision that the father's rights should not have been terminated virtually eliminates any possibility that the child is adoptable. See *In re Theresa S.*, 196 Conn. 18, 31, 491 A.2d 355 (1985). The claim of error that the trial court considered the suitability and circumstances of potential adoptive parents is thereby rendered moot.

port are indicia of "interest, concern or responsibility" for the welfare of a child. *In re Luke G.,* 40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985). Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred. *In re Juvenile Appeal (Docket No. 9489),* 183 Conn. 11, 438 A.2d 801 (1981).

The trial court found a number of facts relating to the mother, without separating which of them related to which ground for termination. These facts, not all of which relate to abandonment, are as follows. In 1980, the mother "abandoned her family," and had no contact with the child for one year until 1981, when she was reunited with her husband and child. The mother has not visited the child as often as possible, the mother "cannot or perhaps does not care to try to understand" the child's needs, the child enjoys seeing her mother, the mother does not call or visit the child, the father takes the child to visit the mother when he has the child, if "she asks him to," the mother had schooling to the fourth grade and does not understand her daughter's medical problems, "has never attended the clinics and appears not to really care, and obviously cannot care for the child," the mother feels the foster parents are better able to care for her child, and she "cannot and appears not to want to have the burden of this child's care thrust upon her."

There is no evidence to support the finding that the mother had no contact with the child for one year. The only evidence is that she went to Puerto Rico in 1980, for no more than two and one half weeks upon leaving her family. The record is silent as to whether she had any contact with her daughter upon her return while her child was living with her brother-in-law.

Most of the court's findings relate to the inability of the mother to care for the child. The mother admits she cannot care for the child. An inability to give the exceptional care required by this child's medical condition is not equivalent to the failure to maintain a reasonable degree of interest, concern or responsibility for the child. The transcript reveals that the mother is sorrowful and concerned about her separation from her daughter, and usually sees her on a bi-weekly basis, although admittedly not at the home of the foster parents since she has no car. She displays love and affection for the child, does have personal interaction with her, and expresses a concern for her welfare. The belief that the foster parents are better able to care for her daughter is not necessarily an indication that she has statutorily abandoned her child, but may be an indication that she places her daughter's health above her own desire to be with her daughter on a daily basis. The temporary leaving of her family in 1980 is not a sufficient basis to find a failure to maintain a reasonable degree of interest, concern or responsibility for the welfare of the child.

"Maintain" implies a continuing, reasonable degree of concern. No fact indicates that she failed to maintain her parental relationship with her daughter. A failure to telephone the child or to travel thirty miles to visit with her when the mother has neither a telephone or a car is not a ground for finding abandonment. If that were so, parents who become noncustodial parents following a dissolution of marriage would be subject to having their parental rights terminated on the ground of abandonment.

It was clearly erroneous for the trial court to find that the mother had abandoned her child within the terms of General Statutes (Rev. to 1981) § 17-43a (a) (1), as amended by Public Acts 1982, No. 82-202.

## III

The trial court also found that the mother's parental rights should be terminated pursuant to General Statutes (Rev. to 1981) § 17-43a (a) (4), as amended by Public Acts 1982, No. 82-202. This section requires that there be "no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Under this section, prior to the 1983 amendment, the court must first make a determination that no parent-child relationship exists and then, if that is so, it must determine if, in the future, the child's best interest would not be served by allowing time for the establishment or reestablishment of the relationship. *In re Juvenile Appeal (84-3)*, supra; *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 420 A.2d 875 (1979); see note, "The 'Two-Pronged' Inquiry—The Best Alternative for the Conflicting Rights Involved in Proceedings for Termination of Parental Rights," 13 Conn. L. Rev. 709 (1981).

The court found no facts, relating to this statutory ground other than as previously stated. The question is whether they substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment. *In re Juvenile Appeal (84-3)*, supra; *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 670-71, 420 A.2d 875 (1979).

The facts here are that the mother has maintained contact with her daughter, the child recognizes her as the natural mother, and is happy to see her. The child,

therefore, does have present memories and feelings for her natural parent. *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 436 A.2d 290 (1980). A present ongoing relationship exists. Although there was evidence as to the suitability of the foster parents as adoptive parents which is relevant to the child's best interest, such evidence only becomes relevant to whether parental rights should be terminated if there is no ongoing parent-child relationship. *In re Juvenile Appeal (84–3),* supra. It was clearly erroneous to terminate the mother's parental rights under General Statutes § 17-43a (a) (4), as amended by Public Acts 1982, No. 82-202, as it existed as of the date of the petition brought by DCYS. If the statute as amended by Public Acts 1983, No. 83-478, were the governing statute, the result might well be different.

There is error, the judgments are vacated and the cases are remanded with direction to render judgments for the respondents.

In this opinion the other judges concurred.

