Memorandum of Decision
On July 31, 1998, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Debra M. and Nerland S. to their minor children, Matrien S., Junior S., and Nicole S., and to terminate the parental rights of Debra M. and Amos G. to their minor son, Adner M. On July 16, 1999, the court, after a trial at which the mother failed to appear, entered findings terminating the mother's parental rights to all four children. On September 1 and 2, 1999, a consolidated trial of the termination petitions against the two fathers took place. For the reasons stated below, the court now grants the termination petitions in their entirety.
FACTS
The court finds the following facts and credits the following evidence. In 1984, at age eighteen, the mother, Debra M., married Nerland S. They had two boys: Matrien S., born June 24, 1985, and Junior S., born March 26, 1987. The couple had a third child, Nicole S., on March 25, 1988, after they were divorced. Debra had a nonmarital relationship with Amos G. in 1988 and 1989 that led to the birth of Adner M. on October 16, 1989.
Matrien lived in foster care from ages two through six; Junior, from birth until age five. In 1991, Nerland, who was living in New York City, regained custody of the two boys but later that year returned them to their mother. Between 1991 and 1995, the boys moved back and forth between their New York father and Connecticut mother. Nicole and Adner have never lived with their fathers.
On June 22, 1995, the court issued an order of temporary custody placing all four children with DCF. On March 12, 1996, the court adjudicated the children neglected and committed them CT Page 12503 to DCF custody for a period of one year.[2] The presenting issues have been drug use by the mother, abuse by the mother's subsequent boyfriend, risk of injury by the mother and her boyfriend, and unstable housing.
Nerland is a native of Haiti. His native language is Creole. Nerland also speaks and understands English, as evidenced by his conversations in English with DCF social workers, a foster mother, and his own children. For the past ten years, Nerland has been employed as a painter for a New York City hotel, making approximately $32,000 in 1998. He is remarried and lives in an apartment with his wife and their two children. Nerland has returned to Haiti once or twice a year for the past four years to visit his family.
Soon after obtaining custody of the children, DCF told both fathers that they could visit their children liberally and could phone or write without restriction. DCF supplied the names, addresses, and phone numbers of the foster homes and provided Nerland with updates concerning Matrien and Junior, whose placement changed a number of times. Between June, 1995, and July 31, 1998, Nerland S. did not visit, provide any gifts, or send any correspondence to any of his three children in foster care. He called Nicole on several occasions in 1996 or 1997. Nerland attended two court hearings in 1995 and had occasional phone contact with DCF during this time period.
Between October, 1998 and July, 1999, Nerland visited Nicole on three occasions. On those occasions, he gave her money or took her shopping. On other occasions during this time period, he sent her gifts from Haiti. He also began phoning Nicole several times a month. Nerland visited Junior twice and Matrien once within this time period. In February, 1999, despite the pendency of the termination petition, DCF agreed to facilitate visits by Nerland every other week. Nerland did not take advantage of this opportunity, in part because he was visiting Haiti. In July, 1999, DCF prohibited further contact with the children. Nerland attended two court hearings in 1998 and was present at trial.
Amos G., who is also a native of Haiti, visited Adner regularly after his birth in 1988. Debra's subsequent boyfriend then interfered with Adner's contact with his natural father. Amos visited his son once in foster care in July, 1995, and then moved to Pennsylvania to work, apparently in unskilled labor. Amos had no other contact of any kind with his son through July CT Page 12504 31, 1998. Amos called DCF once in 1997 to inquire about having child support deducted from his pay, but never followed up. In October, 1998, Amos appeared in court and visited Adner. Subsequently, Amos sent him $60. Amos failed to appear for trial.
Junior and Matrien have been in about eight foster placements over the past four years. Presently, Junior is in a residential placement and Matrien is in a temporary shelter. Both boys have experienced developmental delays and emotional difficulties. Both are receiving therapy or counseling. Junior has been hospitalized on two occasions for emotional problems. The boys are close to each other. They have spoken positively of their father, but do not want to live with him because they believe that they were abused by his second wife when they were living together in New York. DCF's plan for the boys is adoption. DCF realizes it will be difficult to find adoptive parents for the boys because of their adolescence and their special needs, but believes that termination will make adoption more likely.
Nicole and Adner have been in the foster care of Mari R. since their initial placement in June, 1995. Both children are doing well in school. They are bonded with each other. Mari R., who has performed admirably as a foster mother, is not available to adopt Nicole or Adner. Nicole has stated she would like to go home with her father. Nicole has phoned him and her New York half-sister on occasion and enjoyed her father's recent visits, although she has also complained that he makes unfilled promises to buy her things. Adner has also stated that he would like to be with his father. DCF's plan is to keep Nicole and Adner together in a new adoptive home.
DCF recently requested New York and Pennsylvania authorities to conduct home studies of Nerland and Amos, respectively, to determine their suitability for custody of their children. Both agencies returned negative recommendations.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification CT Page 12505 efforts." General Statutes § 17a-112(c)(1).[3] The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112(c)(1). Such a finding was made by Judge Driscoll on March 11, 1998 and February 2, 1999 in extending the children's commitment to DCF.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112(c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
There being no amendments to the petition, the adjudicatory date in this case is July 31, 1998. DCF has alleged the ground of abandonment against both fathers. The court finds that DCF has proven its allegations by clear and convincing evidence.
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id., 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
Applying these standards, the evidence overwhelmingly shows that both fathers abandoned their children. During the entire adjudicatory period from June, 1995 to July, 1998, Nerland S. CT Page 12506 never visited his children, provided them any gifts, or sent them any correspondence. His occasional phone calls to Nicole and contact with DCF during this time period were woefully insufficient.
At trial, Nerland attempted to excuse his absence from his three children's lives on the grounds that he did not speak English well, that he did not have sufficient information about visitation procedures, and that he did not have the money to travel to Connecticut. The court has already found that Nerland spoke English adequately and that DCF provided him sufficient notice and information about the children's placements. Further, Nerland, while not a wealthy person, had a decent job and was able to travel to Haiti to visit family there. Moreover, it is simply a basic obligation of parenthood, regardless of the circumstances, to maintain contact with one's children. See In reJuvenile Appeal (Docket No. 9489), 183 Conn. 11, 15, 438 A.2d 801
(1981). If Nerland was unable to maintain contact on his own, he should have sought help. The evidence showed that he knew how but chose not to do so.[4]
Amos G. visited Adner only once and had no other contact with his son during the adjudicatory period. He inquired about child support in 1997 but did not follow up. On the basis of all this evidence, the court finds that DCF has adequately proven abandonment against both fathers.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Matrien and Junior S. clearly and convincingly requires termination of the parental rights of their father. Nerland has no relationship with them. They do not want to live with him. They also have special needs that the father does not seem equipped to meet. Although it may be difficult to find adoptive families for them, termination will enhance the possibility of adoption.
The case of Nicole is more challenging because Nicole has CT Page 12507 expressed a desire to live with her father, because she and her father have recently had some successful visits, and because Nicole's foster mother is unable to adopt her. The court nonetheless finds that the best interest of Nicole warrants termination of Nerland's rights. Nicole has never lived with Nerland. Nerland abandoned her for over three years. It was only after DCF filed its termination petition and termination of parental rights became a more likely possibility that Nerland resumed contact with her. Even then, Nerland saw her only three times in one year. Enjoyable visits and a sprinkling of gifts may build hopes in an eleven year old girl who is faced with leaving a stable foster placement, but they are no substitute for regular contact, guidance, and support, which Nerland did not provide. Nerland has had more than enough opportunity to prove himself a worthy parent to Nicole and he has failed to do so. Nicole will be better off in an adoptive family that will fully commit itself to her. Further, DCF's plan calls for Nicole to be adopted together with Adner, with whom she is bonded.
Adner's case is clear-cut. His father, Amos G., is virtually a stranger. Economic circumstances undoubtedly made it difficult for Amos to travel from Pennsylvania to visit, but it was Amos's choice to move to Pennsylvania knowing that Adner was in foster care in Connecticut. While it is unfortunate that Adner will have to leave his current foster home, where he has prospered, adoption by adults who will attend to his daily needs is a better option than placement with a father who has abandoned him. Adoption will also allow him to remain with his half-sister, Nicole.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362, 664 A.2d 1168 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for the children and offered the fathers regular and liberal visitation and contact. These services were relevant to the fathers' needs and were offered in a timely manner. CT Page 12508
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the fathers appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The court did not enter expectations for the fathers because they did not appear in court at the time of the neglect adjudications.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, the children are not bonded to any adult care takers.
5) The age of the child.
Matrien is fourteen years old; Junior is twelve; Nicole is eleven; and Adner is almost ten.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the fathers did not adjust their circumstances so as to make it in their children's best interest to return to their homes. The CT Page 12509 fathers did not maintain regular visitation with their children or regular contact with their custodians.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the fathers' abandonment of their children is a result primarily of their own choices and not the result of the unreasonable conduct of other people or economic circumstances.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Matrien S., Junior S., and Nicole S. for a termination of parental rights to enter with respect to their father, Nerland S., and in the best interest of Adner M. for a termination of parental rights to enter with respect to his father, Amos G. Because the court has already found that the parental rights of the mother, Debra M., should be terminated, the court now grants the termination petitions in their entirety. The court further orders that the Commissioner of DCF is appointed statutory parent for the children for the purpose of securing adoptive families. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placements and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court