[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 16384
On November 16, 1998, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of the mother and father of Maria B., born July 25, 1993, and Jasmin B., born August 10, 1995, two little girls will had been in foster care for a continuous period of 18 months prior to the filing of the petitions. On April 6, 1999, this court proceeded to trial as to the father, Benjamin B., who never appeared, and on August 3, 1999, entered a judgment terminating his parental rights to Maria and Jasmin on the ground of abandonment. The respondent mother, Milagros A., appeared in court and consented to the termination of her parental rights on January 26, 1999, but withdrew her consent on September 7, 1999 when DCF determined that a proposed relative adoption would not occur. Trial was held on the grounds alleged as to Milagros A. in the petitions on December 6, 1999.
The petitions allege three statutory grounds for termination of Milagros A.'s parental rights. General Statutes § 17a-112 (c), in pertinent part, provides for termination if "(A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;" "(B) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child; and "(D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment. In re Joshua Z.,26 Conn. App. 58, 63, 597 A.2d 842 (1991), cert. denied 221 Conn. 901 (1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, CT Page 16385 establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both issues is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v.Anonymous, 179 Conn. 155, 172-173, 425 A.2d 939
(1979); In re
Juvenile Appeal (84-BC), 194 Conn. 252,258, 479 A.2d 1204 (1984); In reNicolina T., 9 Conn. App. 598, 602, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); Inre Emmanuel M., 43 Conn. Sup. 108, 113,648 A.2d 904, cert. denied 231 Conn. 915,648 A.2d 151 (1994).
 I FACTUAL FINDINGS
At trial, DCF introduced the testimony of Donaicis Alers, a DCF social worker. The social study for termination of parental rights was submitted by stipulation as Exhibit A. Milagros A. and the children's attorney called no witnesses and submitted no evidence.
At the commencement of the trial, the court indicated that it would take judicial notice of the prior court rulings and notations contained in memorandums of hearings held in the Hartford Superior Court for Juvenile Matters records regarding Maria and Jasmin since April of 1997. No one objected to the court's proposal concerning items to be judicially noticed. SeeIn re Mark C., 28 Conn. App. 247,251-254, 610 A.2d 181 (1992).
The credible and relevant evidence offered at trial, interpreted in light of the prior court record concerning Maria and Jasmin, of which judicial notice is taken, supports the finding of the following facts:
On April 15, 1997, a petition alleging that Maria and Jasmin were neglected and uncared for children was filed by DCF, along with motions for orders of temporary custody, which were granted. At the time the neglect and uncared for petitions were filed, Milagros A. had resumed a relationship with the children's father, Benjamin B., despite a series of domestic violence incidents which had led to the father's arrest. Milagros had CT Page 16386 refused services to address her susceptibility to father's abuse. Milagros and Benjamin had lived together since 1994, after Milagros became pregnant with Maria. Benjamin began to use drugs and abuse alcohol, which would cause him to become physically abusive toward Milagros. The family had been evicted from numerous apartments because of Benjamin's destructive behavior. Little Maria had witnessed the domestic violence, including an incident when she watched Benjamin cut Milagros on the hand with a knife. In January of 1997, Milagros had reported to DCF that she was afraid of Benjamin, who was calling and, threatening to kill her. She indicated she had obtained a restraining order. In spite of these fears, mother allowed Benjamin back into her home and left Jasmin in his care in April 1997. When a DCF social worker found Benjamin alone in mother's apartment with Jasmin, the children were removed from the home.
A. Mother, Milagros A.
Milagros A. was born on May 27, 1975 in Rio Piedras, Puerto Rico. She spent much of her youth in Miami, Florida, graduating high school and attending an ROTC program for three years. After ROTC, she moved to Hartford to live with her maternal great aunt, Argentina A., (who later served as Jasmin's foster placement for two years). Milagros describes her upbringing as depressing and abusive. She was sexually abused by a relative and attempted suicide at the age of 15. After Milagros moved to Hartford, she found a job at Pratt and Whitney where she met Benjamin and became pregnant with Maria. This relationship, as described above, was not a healthy one.
In December of 1997, a physician at the Connecticut Children's Medical Center in Hartford made a referral to DCF that the hospital's Child Protection Team had diagnosed Milagros with Munchausen by Proxy Syndrome. The team reported that Milagros had fabricated for Maria a history of seizures, failure to thrive and allergies. Milagros would give elaborate medical history to physicians that had no basis in fact. Milagros missed Maria's routine appointments, only to appear at the emergency room with the child soon after. On one emergency room visit, Maria was given unnecessary medication due to mother's fabrication of symptoms.
In addition to the abusive relationship Milagros had with Benjamin, she also reported to DCF in March of 1997 that another ex-boyfriend was harassing her. Subsequent to the removal of CT Page 16387 Maria and Jasmin by court order, Milagros lived in a number of different locations in the Hartford area, including shelters and apartments that DCF helped her find. In 1998, she gave birth to her third child in a shelter. Mother often had to move for either overextending her allotted time or due to incidents of domestic violence. In June of 1998, Milagros was involved in a domestic dispute with a new boyfriend, one Jose R., the father of her third baby, that if Milgaros with bruises on her face. This incident caused Milagros to lose another apartment. DCF intervened and helped her find temporary housing at a battered women's shelter. In July of 1998, mother and her new baby were forced to leave the shelter due to a dispute with another resident. DCF helped mother find another temporary residence at the East Hartford Shelter. In October of 1998, Milagros moved to an adult self-help home in Hartford, another temporary situation, and rented a room for herself and her new baby. For over a year after the removal of Maria and Jasmin, mother failed to find a stable job or permanent housing. She has had no family support able to provide for her and her children in order to supplement her scarce personal resources. Benjamin has not been located and the father of her third child, Jose R., as of the date of the filing of these petitions, was incarcerated for beating Milagros. On October 2, 1998, Milagros disclosed to DCF that she was expecting her fourth baby and that the father was the abusive Jose R. DCF has been assisting Milagros in finding day care for her third baby as well as a job, permanent housing and assistance in keeping her children's medical appointments.
Although Milagros continued to accept assistance from DCF, particularly after the birth of her third baby, she has not seen either Maria or Jasmin since June of 1997 and she has made no effort to communicate with them through cards, gifts or letters. Jasmin lived with Milagros' only relative resource, her great aunt, Argentina A., for two years, yet Milagros, although permitted, did not visit Jasmin at her aunt's home from June of 1997 to the date of the filing of these petitions. Despite Milagros' giving birth to two more children since Maria and Jasmin was removed from her custody, she indicated to DCF that it would be too painful to her to see the older girls since she could not provide for them.
B. Maria and Jasmin B.
Maria is now six years old and described as a friendly, loving child. After her removal from her mother when she was CT Page 16388 three, she spent two years in a non-relative foster home. She only saw her mother three times, and her last contact with Milagros was in June of 1997. Maria has experienced developmental delays and exhibits hyperactivity. Although Milagros constantly sought medical attention for Maria when Maria was still in her care, the child has exhibited no health concerns since her removal from her mother's care. She is functioning at a preschool level and requires one-on-one teaching.
Jasmin is now four years old and doing very well developmentally. A serious asthma condition requires the consistent use of medication and apparatus to make sure she breathes adequately. She has no other major health concerns.
Maria and Jasmin never ask about their biological mother. When their maternal great aunt voluntarily surrendered her foster care license, DCF's plan to place Maria with Jasmin so this aunt could adopt them fell through. About six months ago, DCF placed the two sisters in a legal risk adoptive home. However, these new foster parents believe they only can handle adopting one of them, as both girls are very needy. DCF is actively seeking a new adoptive home for Jasmin that will enable the continuation of contact between the sisters. The social worker testified that both girls already call these foster parents "mommy" and "daddy" and appear nervous when the foster parents are out of their sight.
 II ADJUDICATION
Each statutory basis set out in General Statutes § 17a-112
(c) is an independent ground for termination. In re Baby Girl B.,224 Conn. 263, 618 A.2d 1 (1992). The petitioner is required to prove one or more of the three grounds alleged in its petitions by clear and convincing evidence.
A. Abandonment — General Statutes § 17a-112 (c)(A).
This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child.
Milagros' level of commitment and responsibility toward her CT Page 16389 two oldest children has been substandard, to say the least. Just a few months after their removal, she demonstrated little interest in visiting them. There is no evidence that Milagros contributed support to Maria and Jasmin since their initial placement in April of 1997. There is no evidence she sent them cards, gifts or letters or telephoned the foster homes or DCF regularly to inquire as to her daughters' well-being. The foster mother who cared for Maria until the spring of 1999 was related to Milagros; even she did not hear from her. This is particularly unsettling when Milagros' continued resort to DCF assistance for her two subsequently born children is taken into consideration.
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M.,6 Conn. App. 194, 209, 504 A.2d 533 (1986).
 "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child' (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122 (1993); In re Roshawn R., 51 Conn. App. 44, 53 ___ A.2d ___ (1998).
Milagros has fallen far short of the above standard.
Statutory abandonment on the part of Milagros has been proven by clear and convincing evidence. She has not manifested a consistent, prolonged and reasonable degree of interest, concern or responsibility as to her daughters' welfare. In re Ravna M.,13 Conn. App. 23, 37-38, 534 A.2d 897 (1987); In reMichael M., 29 Conn. App. 112, 121-123, 614 A.2d 832 (1992).
B. Failure to Rehabilitate — General Statutes § 17a-112 (c)(B).
If the mother of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding falls to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible CT Page 16390 position in the life of the child, grounds for termination exist.
The evidence is clear and convincing that Maria and Jasmin were adjudicated neglected and uncared for and committed to DCF on August 8, 1997. Their commitments were extended for additional twelve month periods twice: on August 6, 1998 and August 3, 1999. On August 6, 1998, this court found that it was no longer appropriate for DCF to continue to make efforts to reunify Maria and Jasmin with either parent.
Personal rehabilitation, as used in the statute, refers to the restoration of the parent to a constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986).
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. In re Luis C., 210 Conn. 157, 167,554 A.2d 722 (1989). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M.,19 Conn. App. 371, 377, 562 A.2d 566 (1989).
When the court issued orders of temporary custody to DCF for Maria and Jasmin in April of 1997, preliminary specific steps suggesting what each parent needed to do to regain custody of the girls were signed by the judge issuing the order. The preliminary steps required that Milagros keep all appointments with DCF and cooperate with home visits. She was to keep her whereabouts known to DCF and her attorney, visit the children as often as permitted, participate in parenting, individual, family and domestic violence counseling, obtain and/or cooperate with a restraining order to avoid future violence, cooperate with in home support services referred by DCF, sign releases to monitor her progress with services, secure and maintain adequate housing and legal income and not engage in any substance abuse or criminal behavior. While a parent's compliance with expectations set after the adjudication of the neglect or uncared for case or the parent's success in fulfilling service agreements entered into with DCF are relevant to the rehabilitation finding, the fulfilling of expectations is not the dispositive issue, albeit an important consideration. In re Luis C., supra,210 Conn. 167-168. The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume CT Page 16391 the responsibilities of parenting than she was at the time of the commitment. In re Michael M., supra, 29 Conn. App. 126. In this case, the answer to that question is a resounding "no."
The evidence in this case is clear and convincing that Milagros, as of the date of the filing of the termination petitions on November 16, 1998, had not achieved a reasonable degree of rehabilitation, and there is no evidence of conduct prior or subsequent to the date of the filing of the petitions which would encourage the belief that within a reasonable period of time, considering the ages and needs of Maria and Jasmin, she could assume a responsible position in their lives. Milagros did not fulfill crucial components of the specific steps recommended by the court on the day the two girls were removed. Both prior and subsequent to the removal of Maria and Jasmin, DCF offered Milagros numerous services including individual counseling at the Institute for Hispanic Families to specifically address the Munchausen by Proxy condition, a parent aide, parenting classes at Centro de Familias, and shelter and domestic violence counseling at Interval House. Milagros declined to participate in these services, although she continued to rely on DCF for housing assistance on the numerous occasions she became homeless. Mother attended the temporary custody 10-day hearing on April 25, 1997 and was appointed counsel at state expense due to her indigency. However, on August 8, 1997, she failed to appear for the trial on the neglect and uncared for petition, and the court indicated to her counsel that no final set of specific steps would issue until Milagros requested and appeared at an in court judicial review hearing. It wasn't until August of 1998, after this court determined that continued efforts toward reunification were no longer appropriate and approved the filing of a termination petition as a permanency plan, that Milagros filed a motion seeking specific steps, which this court denied.
While Milagros has given birth to two more children who are still infants since Maria and Jasmin were removed, this fact alone provides the court with no evidence of rehabilitation. For one thing, DCF has another worker assigned to Milagros for the purpose of monitoring her care of these children. There was no evidence that provided any indication as to mother's income, living situation or efforts at addressing the issues that caused her to lose custody of Maria and Jasmin. The lack of even a minimal description as to the nature or content of her present programs, if any, persuades the court that she has not conquered her past problems sufficiently or that her rehabilitation to a CT Page 16392 useful and constructive parental role for her two older children is probable in a reasonable period of time. No concrete or realistic plan was proposed by Milagros during the trial that soon would permit the return of Maria and Jasmin. Due to Milagros' lack of contact with these two girls for almost three years, any proposed reunification plan would have to include the expenditure of a significant period of time, with little assurance of success, just encouraging Milagros to become reacquainted with them. In addition, the court has been given no sign that Milagros has ever addressed her Munchausen by Proxy Syndrome diagnosis, which exposes Maria, at least, to potential harm.
The evidence is clear and convincing that Milagros has not achieved a status where she is more able to parent Maria and Jasmin than she was at the time of their initial commitment, nor is there any evidence to conclude that rehabilitation to the role of a constructive parent could be achieved within a reasonable period of time.
The court believes further delay in this case to attempt to promote more efforts at rehabilitation on the part of Milagros would be severely injurious to these children, who have been in foster care for over two years. Both girls require a safe, permanent and secure home with caretakers who can address their special needs. Maria already has become attached to her new foster parents, who wish to adopt her. DCF still must find a permanent home for Jasmin, who has less developmental issues than Jasmin, but does suffer from severe asthma. The second ground alleged for termination has been established by clear and convincing evidence.
C. No Ongoing Parent-Child Relationship — GeneralStatutes § 17a-112 (c)(D).
"Under this section, . . . . the court must first make a determination that no parent-child relationship exists and then, if so, it must determine if, in the future, the child's best interest would not be served by allowing time for the establishment or reestablishment of the relationship. " In reMigdalia M., 6 Conn. App. 194, 211, 504 A.2d 532 (1986). An ongoing parent-child relationship means "the relationship that ordinarily develops as a result of a parent having met, on a day to day basis the physical, emotional, moral and educational needs of the child. . . ." General Statutes § 17a-112 (c)(D). CT Page 16393
When Maria and Jasmin were removed from their mother's care they were, respectively. 3 and 1 years of age. In the time since their removal, Milagros visited them only three times, had no contact with them at all after June of 1997, failed to attend crucial court hearings, and made little effort to take steps which could have enabled her to reestablish a parent-child relationship with them. It is highly unlikely that any parental bond remains after such a prolonged lack of parental involvement involving two very young children. The social worker, Alers, testified that neither of these children ever speak of Milagros as their mother, and they have quickly adapted to calling their new foster parents "mommy" and "daddy." During the time that the children have been in state care, Milagros has made little progress towards achieving a stable rehabilitation. In fact, she persisted in another abusive relationship which resulted in two more out-of-wedlock children.
The clear and convincing evidence at trial proved that there is no ongoing parent-child relationship between Milgaros A. and her two older daughters, and that it would be detrimental to the children's best interests to allow the mother any additional time to reestablish such a relationship.
 DISPOSITION
1. Section 17a-112 (e) Criteria
The court has found by clear and convincing evidence that all of the statutory grounds alleged by the petitioner for the termination of the Milagros A.'s parental rights have been proven.
Before making a decision whether or not to terminate Milagros' parental rights, the court must also consider and make findings on each of the seven criteria set forth in § 17a-112
(e). In re Romance M., 229 Conn. 345,355, 641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent." CT Page 16394
DCF offered timely and appropriate services to Milagros to promote reunification, which are more fully described on page 10 of this decision. In addition, DCF offered visitation and care and investigated several relatives as possible foster placements for Maria and Jasmin.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
As noted in paragraph (1) above, DCF made reasonable efforts to reunite the family.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
Preliminary specific steps were issued in April of 1997. Milagros should have been aware of these, as she was represented by counsel at the time of the 10-day temporary custody hearing, although she never signed them. Although Milagros maintained contact with DCF, her compliance with these steps was minimal. Final steps were never issued because mother waited until after a permanency plan for termination was approved, almost a year and a half after the children's removal, to ask for final specific steps.
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties."
Jasmin and Maria have no parental bond with their biological mother. Both of them have specialized needs that require a stable, consistent, loving and permanent home. Neither of them is currently in a foster placement which has been in existence for at least one year, although both have quickly become attached to their present foster parents.
(5) "The age of the child."
Maria was born on July 25, 1993 and is 6 years old. Jasmin was born on August 10, 1995 and is four years old. Maria has CT Page 16395 spent almost half her life in foster care; Jasmin has spent over half of her life in that status. The federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et. seq., as amended, mandates that after 12 months in foster care a child must have a plan for a permanent home. In re Samantha B.,45 Conn. Sup. 468, 479, ___ A.2d ___ (1998). Foster care should be a strictly limited episode in the life of a child. Maria and Jasmin have been in foster care for almost 31 months. They deserve permanent homes without further delay.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communications with the guardian or other custodian of the child."
After 3 visits with the two girls in the first few months subsequent to their removal, Milagros made no little or no effort to maintain contact, describing it as too painful since she could not provide for them. Milagros' admission that she was unable to do this was subsequently contradicted by her involvement with another violent man and her giving birth to two more out-of-wedlock children. She did not maintain regular contact with Maria and Jasmin through cards, gifts or letters, nor did she inquire as to their well-being when contacting DCF. There is no evidence she had contact with the foster parents, even though one was her own relative. There is no evidence she has secured adequate housing or stable income in order to provide care for her two older children, and there is no evidence she has engaged in the counseling recommended to address her psychological problems.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is no evidence that indicates that DCF or any other person unreasonably interfered with Milagros' ability to maintain CT Page 16396 a relationship with Maria and Jasmin. Her extended and unjustified absence from their lives is completely of her own volition.
There is no evidence that economic circumstances have constituted a significant factor in Milagros' failure to maintain a meaningful relationship with her daughters. The state provided her with counsel at no expense to her throughout proceedings affecting Maria and Jasmin since the spring of 1997, which she attended sporadically. After Maria and Jasmin were removed, Milagros gave birth to two other children. Although she may be cooperating with DCF's efforts to insure the well-being of her younger children, (although little evidence was presented on this), she waited far too long to resume any interest or efforts to regain the custody of Maria and Jasmin. Regrettably, it is as if she replaced her two daughters with two additional children. She even gave one of the younger ones the first name of Jasmin.
2. Best Interests of the Children
The court must now address the issue of whether the termination of parental rights is in the best interest of the children. This is the dispositional phase of a termination proceeding. In re Valerie D., supra, 223 Conn. 511.
More than two years after their removal from their parents, Maria and Jasmin were placed in a pre-adoptive home in the summer of 1999 when the initial plan of adoption by their maternal great aunt failed. They have no present relationship with Milagros and have adjusted very well to this new foster family; unfortunately, the family has determined that both children are so needy it would not be fair to try to adopt both of them. They are willing to adopt Maria, who requires the most specialized care. DCF is actively seeking another placement for Jasmin that will allow the two sisters continued contact.
Milagros admits she went about her transient and irresponsible existence with little regard for Maria and Jasmin for many months after they were removed. She has presented no concrete or viable plan for reunification within a reasonable time period, nor has she shown the court she has learned parenting responsibilities or addressed her serious parenting deficiencies.
Based upon the foregoing findings, the court concludes that CT Page 16397 the evidence is clear and convincing that the best interests of Maria and Jasmin are served by the termination of their mother's parental rights so they may be freed for immediate adoption. The court notes that counsel for the children fully supports this result as being in the best interests of the children so that they can be provided with a permanent and stable home as soon as possible.
 CONCLUSION
The petition is granted and judgment may enter terminating Milagros A.'s parental rights in Maria B. and Jasmin B. Pursuant to General Statutes § 17a-112 (i), it is ordered that the commissioner of DCF be appointed statutory parent so that these little girls can be placed for adoption. The statutory parent shall report to the court within sixty days on a case plan for Maria and Jasmin. A review plan for each of them shall be filed in accordance with state and federal law until such time as adoptions are finalized.
KELLER, J.